KANAWHA BANKING & TRUST COMPANY, A CORPORATION, AND ARTHUR M. HILL, EXECUTORS OF THE ESTATE OF FREDERICK M. STAUNTON, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 45710. Promulgated November 21, 1933.

*J. D. Altizer, Esq., H. D. Battle, Esq.,* and *T. B. Price, Esq.,* for the petitioners.

*T. M. Mather, Esq.,* for the respondent.

OPINION..

MATTHEWS: With respect to the shares of stock in the Kanawha City Co., the only issue raised is the value at which they should be included in decedent's gross estate. With respect to the land owned by decedent in West Virginia, there are two issues: (1) Whether this land could properly be included as part of the estate under West Virginia law, under the doctrine of *Crooks* v. *Harrelson*, 282 U.S. 55; and (2) if so, its value on the basic date. The parties stipulated that the 1,000 shares of common stock of the Kanawha Land Co. held by decedent at his death had a value for estate tax purposes of $50 a share, or altogether $50,000, and effect will be given thereto in the computation under Rule 50.

1. The value of the stock of the Kanawha City Co. is a question of fact, to be determined from the evidence. As the stock of the Kanawha City Co. was closely held by a few stockholders, and as the sales nearest the basic date were two sales of small blocks at $100 a share made in 1920, we have considered the underlying assets, the record of earnings of the company, the facts and circumstances which would affect the future earnings of the company and the value of the stock, and opinion evidence as to the value of the stock on the basic date. Aside from evidence as to the past sales, earnings, carrying charges, and dividends paid by the company, the petitioner offered the oral testimony of a number of witnesses. These witnesses testified as to the value of the lots and hill lands, the state of the real estate market at the date of decedent's death, the situation as to the bridge, and the prospects of the company; taking these factors into consideration, as well as the value of the bridge and the value of current assets, which were stipulated, and the past earnings of the company, these witnesses testified as to the fair market value of the stock at date of decedent's death.

The petitioner's witnesses were eminently qualified to give fair and unprejudiced opinions on the value of the tangible assets underlying the stock, the circumstances affecting the prospects of the company, and the fair market value of the stock. The witness, H. D. Smarr, had been an appraiser of Staunton's estate. He had been for many years a dealer in real estate, coal, oil, gas, and timber lands in Charleston, Kanawha County, and the vicinity; and he had been for some years before 1926 in close touch with decedent and the Kanawha City Co.'s business. He controlled a company which was buying and selling lots in the same region. He had bought lots in Charleston,

Kanawha City, and other suburbs. Charles K. Payne was and had been for many years vice president and director of the Charleston National Bank and had also been president of a large wholesale shoe company. He owned a great deal of local real estate, had dealt in real estate, and was familiar with local conditions. He had known the Kanawha City subdivision since its inception in the 'nineties. H. C. Capito was a local ice manufacturer, with a good knowledge of local conditions. He likewise had known the Kanawha City subdivision since 1893. Harrison B. Smith had lived in Charleston all his life, was president of the Kanawha Banking & Trust Co., chairman of the board of the Charleston Trust Co., president of the George Washington Life Insurance Co., and, at the time of the hearing, president of the Kanawha City Co. He had been a stockholder in the company for a number of years. He succeeded his brother as president of the company, his brother having succeeded the decedent. Mr. Smith had handled quite a good bit of land company stock. John L. Dickinson was president of the Kanawha Valley Bank, of the Central Trust Co., and of the Dickinson Co., which had substantial land holdings around Charleston. Isaac Loewenstein was president of the Charleston National Bank and of the Loewenstein Realty Co., with large holdings. He had known the Kanawha City subdivision since 1900. These witnesses were among the leading business men in Charleston, had dealt in real estate on their own account, and had a full knowledge of conditions affecting the values of the land and of the stock. In view of the general character of petitioner's witnesses and the full opportunity they had to inform themselves upon local conditions and factors of value at the basic date, their testimony as to the value of the stock deserves most careful consideration.

In general, the testimony of each of petitioner's witnesses, while not identical with that of the other witnesses, corroborated the testimony of the others. The majority of the witnesses placed the fair market value of the stock at $150 a share. Some of them expressed doubt as to whether it could have been sold for that much, but were positive that it could not have been sold for more than that. One witness placed the value of the stock at from $150 to $200, and another from $130 to $175.

Respondent's sole witness, D. E. Good, had lived in Charleston 25 years, was in the insurance, real estate, and mortgage loan business, and had often made appraisals of real estate. He testified as to the value of the underlying assets and based his valuation of the stock at $627 a share, solely on the value of the underlying assets, on a supposed valuation of the bridge of $500,000. Reducing this value of the bridge to $300,000, his value of the stock would be $497 a share. He did not take into consideration the past earnings of the

company, the market condition which might affect the sale of the real estate by the company, or the fact that the earnings from the bridge would shortly cease. We do not consider Good's testimony sufficient to overcome that of the petitioner's witnesses.

A glance at the sales of lots during the period 1914 to the basic date, and at the net income of the Kanawha City Co. for the same period, clearly shows that the prospective earnings of the company could not be gauged by the average earnings for the five years preceding the basic date. The consolidated net income for the entire twelve-year period, after payment of dividends on preferred stock, was $300,422.29, or an annual average of $25,035.19. In our opinion, the average earnings of the whole period would, under the circumstances of this case, more nearly indicate the earnings to come than the average of the five years preceding 1926. If, therefore, we test the value placed on the stock by petitioner's witnesses with the value obtained by capitalizing the average earnings of the entire period at 6 percent, we obtain $417,253 as the valuation of the 3,000 shares, or $139 a share. This indicates that the value of $150 is not too low. On the evidence, therefore, we have found that the stock had a value of $150 a share.

We come now to the value of the decedent's one-fourth undivided interest in 210⅓ lots, 5,928 front feet, in Kanawha City. They were on an average better situated than the Kanawha City Co.'s lots, were considerably fewer in number and therefore more easily disposed of, and got the benefit, without added expense, of the company's general improvements. The decedent's interest was valued by respondent at $43,253.75; by the petitioner at $29,640, or at $20 a front foot. A number of petitioner's witnesses quite familiar with local conditions sustained by their evidence petitioner's valuation of $20 a front foot on these lots held by the decedent in trust, and this valuation has not been seriously challenged by the respondent. As these lots were few and reasonably salable, we have fixed that value accordingly.

Was this land situated in West Virginia includable at all in the decedent's gross estate? This is the final question at issue. Petitioner contends that under the rule of *Crooks* v. *Harrelson*, 282 U.S. 55, neither the lots just mentioned, nor lands owned by the decedent in Boone County, West Virginia, and included in the gross estate at a valuation of $1,600, are properly includable in the decedent's gross estate. The relevant section of the Revenue Act of 1924, here applicable, is set out in the margin.[1] The Supreme Court in the

---

[1] Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

(a) To the extent of the interest therein of the decedent at the time of his death which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate.

*Harrelson* case, construing section 402 of the Revenue Act of 1918 identical with section 302 (a) of the 1924 Act, held, following *United States* v. *Field*, 255 U.S. 257, that the phrases, "the charges against his estate" and "the expenses of its administration," were conjunctive as to each other and as to the concluding clause, "is subject to distribution as part of his estate." For property of the decedent to be subject to the estate tax, therefore, it must comply with all three conditions. Since in Missouri the common law rule that real estate cannot be sold to pay expenses of administration prevailed and was unmodified by statute, it followed that decedent's real property situate in that state was not includable in the decedent's gross estate. The Court considered and expressly rejected the argument that this construction of the statute, although concededly incongruous in its result, was so absurd as to require its rejection.

The petitioner contends that the statutes of West Virginia have not so far altered the common law rule as to subject the decedent's land in West Virginia to the expense of administration of his estate, and, concededly, if this is the case, we are governed by the case of *Crooks* v. *Harrelson*, and must exclude decedent's land from his gross estate.

It was made clear by that case that the power of an administrator to sell the decedent's land to pay his debts was not in question, and that a commission allowed the administrator on such sale was not an expense of administration, but an expense incidental to the sale of the land. The Court also rejected the further contention that if all the personalty had been used to pay administration expenses, and a sale of the realty was consequently necessary to pay debts and legacies, the land was in effect sold to pay administration expenses; saying that the cause of the sale must not be confused with its purpose. We confine ourselves, then, to the question whether real property in West Virginia may be sold to pay the expenses of administration. That administration expenses are not "debts" is settled in most common law jurisdictions. *Crooks* v. *Harrelson*, *supra; Carr* v. *Hull*, 65 Ohio St. 394; 62 N.E. 439; *Safe Deposit & Trust Co.* v. *Tait*, 54 Fed. (2d) 387. Cf. Woerner on Administration (3d ed.), §469.

The common law, except in so far as modified by the statutes of Virginia before West Virginia's separation therefrom, and by the statute of West Virginia, is expressly declared to be in force in West Virginia (Code 1923, ch. 13, §5). Land descends to the heir at law under the statutes of distribution (Code 1923, ch. 78, §1 *et seq.*), while personalty, "after payment of funeral expenses, charges of administration and debts", is to be distributed to the same persons as are heirs, with certain specified exceptions.

The West Virginia Code (Barnes' Code, Ann., 1923) provides for the marshaling of debts of the decedent (ch. 85, §25) :

§25. *Priorities of claims.*—Where the assets of the decedent in the hands of his personal representative, after the payment of funeral expenses and charges of administration, are not sufficient for the satisfaction of all demands against him, they shall be applied, (1) to debts due the United States; (2) taxes and levies assessed upon the decedent previous to his death; (3) debts due as personal representative, guardian or committee, where the qualification was in this state, in which debts shall be included a debt for money received by a husband acting as such fiduciary in right of his wife; (4) all other demands ratably, except those in the next class; (5) voluntary obligations. (Acts 1872-3, c. 122.)

By section 26, all payments are required to be made in full to one class before to the next succeeding class.

The provision, the interpretation of which is here in question, is as follows (ch. 86, §3) :

§3. *Liability of estate for debts.*—All real estate of any person who may hereafter die, as to which he may die intestate, or which, though he die testate, shall not by his will be charged with or devised subject to the payment of his debts, or which may remain after satisfying the debts with which it may be so charged, or subject to which it may be so devised, shall be assets for the payment of the decedent's debts and *all lawful demands* against his estate, in the order in which the personal estate of a decedent is directed to be applied. (Acts. 1882, c. 69.) [Italics ours.]

Section 4 of the same chapter provides that such assets may be administered by the court in whose clerk's office there is a report of the representative's accounts and "the debts and demands against decedent's estate," or by a court of equity. Section 5 provides that any heir or devisee who shall sell and convey any real estate, which by this chapter is made assets, shall be liable to those "entitled to be paid out of the said assets." Section 6 makes the heir or devisee liable only in equity to any creditor of decedent "to whom a debt is due," with respect to the estate descended. Section 7 provides the machinery for subjecting the real estate to payment, the opening words of this section being, "When the personal estate of a decedent is insufficient for the payment of his debts, his executor or administrator may commence and prosecute a suit in equity to subject his real estate to the payment thereof." Section 8 forbids a decree of distribution of the real estate to "creditors" without publication of notice. Section 9, referring to the same decree, speaks of distribution of the proceeds of the realty "among such of the creditors of the deceased" as are entitled.

It will be observed that there is no provision of the West Virginia law which subjects the decedent's realty to expenses of administration in so many words. We are left, therefore, without further aid from the other provisions regulating payment of decedent's

debts and expenses, to construe the phrase contained in chapter 86, §3, " decedent's debts and all lawful demands against his estate." Counsel for neither party has cited us, nor have we found, any decisions of the Supreme Court of West Virginia construing this phrase. We are left to infer its meaning from its context. As we have already said, administration expenses, under West Virginia law as under the law of other common law jurisdictions, are not to be comprehended under " debts." This leaves only the phrase, " all lawful demands."

The petitioner argues, in this state of uncertainty as to the true intent of the statutes, that we must be governed by the intent of the legislature, and develops an elaborate historical argument beginning with the Code of Virginia of 1849, which is said to contain the first statute subjecting real estate to the payment of debts. The same clause, " shall be assets for the payment of the decedent's debts and all lawful demands against his estate," is still contained in the Virginia law, Code, 1924, §5395, and appears to have been first used in the Act of March, 1842, which, altered by the omission of the proviso that the debt be evidenced by writing, was incorporated in the Code of 1849, Acts 1841–1842, p. 55; Code 1849, ch. 13, §3; cf. *Alexander* v. *Byrd*, 85 Va. 690; 8 S.E. 577; and it came into West Virginia law on the separation of that territory from Virginia and the institution of the State of West Virginia in 1863. See *Virginia* v. *West Virginia*, 206 U.S. 290. The report of the revisers of the Virginia Code of 1849, p. 675, as quoted by petitioner's counsel in his brief, indicates that the intention of the amendment was to prevent a circuitous subjection of the realty to parol contract creditors by marshaling of the assets and to substitute instead a direct method, one consideration for the change being the allowance of claims of those parol creditors who had contracted with the decedent in the last year of his life. It is also said that the words, " all other debts and demands except those in the next class," as used in chapter 130, §25, Code 1849, with regard to the order in which debts and expenses must be paid, could refer only to debts incurred by the decedent during life. The argument is also made that since expenses of administration are ordinarily preferred to any other class of obligation, the use of " debts and lawful demands " to designate obligations which are not to be paid until debts to the United States, taxes assessed before death, fiduciary debts and judgments in Virginia have been satisfied, must show that " debts and demands " could not possibly refer to expenses of administration. We find this argument to some extent persuasive but by no means conclusive.

If we now return to the present code of West Virginia, we find in the provisions dealing with administration of the personal estate of the decedent express mention of " charges of administration." The

personal representative, " unless it be necessary for the payment of funeral expenses, charges of administration or debts," shall not sell the estate which the will directs not to be sold (Code 1923, ch. 85, §15) ; and if the goods sold are insufficient to pay " the funeral expenses, charges of administration, debts, and legacies," the personal representative is authorized to sell more to this end (Code 1923, ch. 85, §17). From the express mention of " charges of administration " in connection with the decedent's personal property and absence of any reference to them in words in connection with his real property, it is argued that " lawful demands" must necessarily exclude charges of administration.

The above mentioned sections dealing with the sale of personalty for debts no doubt contemplate the payment of administration charges from the personalty. As such charges are preferred to all others, it would in fact be very unlikely that resort would have to be had to the real estate. The Supreme Court of West Virginia has held that under §3, ch. 86, making realty assets for " debts and all lawful demands," both personalty and realty are assets for payment of debts, but the personalty is primarily liable therefor. *Crawford* v. *Turner*, 58 W.Va. 600; 52 S.E. 716; *American Bank & Trust Co.* v. *Douglass*, 75 W.Va. 207; 83 S.E. 920. But to say that personalty is primarily liable is very far from saying that when the unlikely occasion arises of an unsatisfied claim for administration expenses being made against realty, realty is not liable to any extent for such charges.

We have carefully considered the case of *Safe Deposit & Trust Co.* v. *Tait*, 54 Fed. (2d) 387 (U.S. Dist. Ct., Md.), cited us by the petitioner, as well as certain other Federal court decisions on the present issue raised in other states. In the *Safe Deposit* case the court held realty in Maryland not liable for administration charges. The Maryland statute, the court thought, was sufficiently similar to the Missouri statute considered in the *Harrelson* case to bring it within the same rule. The Missouri statute provided that if the personal estate was insufficient, realty might be sold to pay " debts and legacies." Code 1919, ch. 1, art. 6, §141. This language is unambiguous. The Maryland statute provided that if the personalty was insufficient to pay debts and costs of administration, realty might be sold to pay " debts ", funeral expenses to the extent of $300 being specifically made a " debt." The court pointed out that sale of realty was to be made only for the payment of " debts ", and argued that the specific inclusion of funeral expenses, ordinarily an expense of administration, as a " debt " precluded the possibility that any other expenses of administration were included in the class of " debts."

Another recent case is *Continental Illinois Bank & Trust Co.* v. *United States*, 60 Fed. (2d) 1063 (U.S. Dist. Ct., Ill.), involving in-

terpretation of the Illinois law. The Illinois statute was clear, expressly including the expenses of administration with decedent's debts as proper cause for sale of the decedent's realty, if his personalty should prove insufficient. The statute's construction, therefore, throws no light on the instant case. Cf. *Marble's Executors* v. *Commissioner*, 64 Fed. (2d) 745, also involving the Illinois statute. In *First Trust Co. of Omaha* v. *Allen*, 60 Fed. (2d) 812, affirming the district court's decision in 51 Fed. (2d) 1069, the circuit court had to construe both the Nebraska and the Iowa statutes. The Nebraska statute expressly included administration expenses as a reason for the sale of realty. The Iowa statute was not so explicit. No Iowa cases had directly passed upon the meaning of the statute, which in § 11933 (Code of 1924) provided, "If the personal effects are found inadequate to satisfy the debts and *charges*, a sufficient portion of the real estate may be ordered sold or mortgaged for that purpose * * *." The court, at page 816, said:

The meaning of the word "charges" in section 11933 is of vital importance. This word is used in contradistinction to the word "debts"; and has a different and a broader meaning than the same word "charges" where it occurs in section 402 (a) of the Revenue Act of 1921. In the latter statute, the word is used in contradistinction to "expenses of administration." We think the word "charges" in the Iowa statute includes expenses of administration, and also other expenditures properly made by the administrator though not strictly expenses of administration, such as funeral expenses. Such broader meaning of the word "charges" is not unknown in probate law.

The court then proceeded to cite cases from other jurisdictions interpreting the word "charges" in support of its view that the term embraced administration expenses.

In the code of West Virginia, chapter 86, § 3, provides that "all real estate" of the decedent "shall be assets for the payment of the decedent's debts and *all lawful demands* against his estate, in the order in which the personal estate of a decedent is directed to be applied." While, as we have pointed out, personalty must be used first, realty is still assets for debts and "all lawful demands." It would be difficult to find more general language, and we are of the opinion that "all lawful demands" was intended to include expenses of administration.

"Demand" is defined by Bouvier, 1 Law Dict., *sub nom.* "demand"; as "A claim; a legal obligation. Demand is a term of art of an extent greater in its signification than any other word except claim. Co. Litt. 291 * * *." See also Words and Phrases, vol. 1, 2d ser.; vol. 2, 3d ser. The word "demand" has been used in the statutes of some states and construed by their courts to include expenses of administration. *United States Fidelity & Trust Co.* v. *People*, 44 Colo. 557; 98 Pac. 828; *State ex rel Temple* v. *Garesche*, 198 Mo. App. 457; 200 S.W. 735. We are unable to find any au-

thority to indicate that " demands " as used in the West Virginia statute has any narrower or more restricted sense than " charges " as used in the Iowa statute construed in the *First Trust Co. of Omaha* case, *supra*.

We are of the opinion, therefore, that real estate in West Virginia is subject to the payment of charges and expenses of administration of the decedent's estate, within the meaning of section 302 (a) of the Revenue Act of 1924, and consequently does not fall within the rule of *Crooks* v. *Harrelson, supra*.

The interest of the decedent, Staunton, in the lots held by him as trustee should, therefore, be included in his gross estate at the value we have determined, together with the lands held by him at death in Boone County, West Virginia, at the value determined by respondent.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

GOODRICH took no part in the consideration of or decision in this report.

TRAMMELL dissents.