ESTATE OF THOMAS W. TEBB, GRACE TEBB, EXECUTRIX, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 54161, 57171, 57172.   Filed January 18, 1957.

*Harry Henke, Jr., Esq.*, for the petitioners.
*John D. Picco, Esq.*, for the respondent.

---

[1] The following proceedings have been consolidated: Estate of Thomas W. Tebb, Grace Tebb, Executrix, Docket No. 54161; Fred R. Tebb and Claire F. Tebb, husband and wife, Docket No. 57171; Neal A. Tebb and Helen R. Tebb, husband and wife, Docket No. 57172.

RICE, *Judge:* This proceeding involves the following deficiencies in tax:

| Petitioner | Docket No. | Year | Tax | Deficiency |
|---|---|---|---|---|
| Estate of Thomas W. Tebb | 54161 | | Estate | $13,294.11 |
| Fred R. Tebb and Claire F. Tebb | 57171 | 1950 | Income | 16,038.36 |
| Neal A. Tebb and Helen R. Tebb | 57172 | 1950 | Income | 14,122.74 |

The issues to be decided are: (1) Whether the respondent erred in his determination of the fair market value of certain closely held corporate common stock, owned by decedent, Thomas W. Tebb, at the time of his death; (2) whether the shares of such stock, which were received by petitioners, Fred R. and Neal A. Tebb, upon decedent's death, constituted taxable income to them; and (3) whether petitioner estate was entitled to the marital deduction as claimed by it on the estate tax return for the interest in decedent's estate which passed to his wife.

Concessions were made with respect to other issues which will be taken into account in a Rule 50 computation.

Some of the facts were stipulated.

### GENERAL FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Thomas W. Tebb (hereinafter referred to as the decedent) died testate, a resident of Sumner, Washington, on June 28, 1950. His widow, Grace Tebb, is the executrix of his estate. Fred R. and Neal A. Tebb were decedent's sons. Fred and his wife, Claire F. Tebb, were residents of Sumner, Washington, in 1950; Neal and his wife, Helen R. Tebb, were residents of Sumner, Washington. The Federal estate tax return and the joint income tax returns of the individual petitioners for 1950 were filed with the former collector of internal revenue for the district of Washington.

### *Fair Market Value of Pacific Stock.*

### FINDINGS OF FACT.

At the time of his death, and for a number of years prior thereto, decedent was president of Pacific Lumber Agency (hereinafter referred to as Pacific), a Washington corporation organized in 1910. Its place of business was located in Sumner, Washington. Pacific's authorized capital stock consisted of 1,500 shares of $100-par-value common stock, which was the only class of stock issued and outstanding. During 1940 and 1941, it had 668 shares outstanding. In 1942 and 1943 it had 750 shares outstanding. In 1944 the issued and out-

standing stock was increased to 1,500 shares by the payment in that year of a stock dividend of 750 shares. Prior to the decedent's death on June 28, 1950, Pacific's stock was held as follows:

| Name | Relationship to decedent | Number of shares |
|------|--------------------------|------------------|
| Thomas W. Tebb | Decedent | 511 |
| Fred R. Tebb | Son | 530 |
| Neal A. Tebb | Son | 210 |
| Mary R. Tebb | Daughter | 94 |
| Alice Virginia Kohl | Daughter | 94 |
| Ella Reese Tebb | Daughter-in-law | 61 |
| Total | | 1,500 |

Pacific's business was the so-called remanufacture of lumber, which involved drying, regrading, dressing, and resawing cut lumber to the specific size and shapes required to fill its orders. About 85 per cent of its production was Sitka spruce products. Pacific neither owned nor controlled timberlands. Its lumber supply was obtained from primary lumber producers and was purchased in the open, competitive market. While the primary producers of Sitka spruce lumber preferred not to market such lumber in a remanufactured state, nothing was done by Pacific in the remanufacture of such lumber which could not have been done by others who did some lumber remanufacturing but who did not specialize in remanufacturing as such.

Pacific sold its products on a competitive basis in the open market, directly and through retail and wholesale distributors located in the midwestern and eastern portions of the United States. Pacific's principal customers were industrial users of Sitka spruce products such as manufacturers of airplane materials, overhead door companies, furniture concerns, ladder manufacturers, sash and door makers, and others. Pacific established and maintained contact with its customers through personal trips by its officers or employees, and by telephone, telegraph, and letter. Many of Pacific's regular customers had been doing business with it for many years prior to 1950. Some of Pacific's customers purchased a portion of the remanufactured lumber used by them from sources other than Pacific.

Pacific's business was built up over a long period of time by decedent and his sons, petitioners Fred R. and Neal A. Tebb. At the time of his death, decedent had been in the lumber business for more than 50 years and had been associated with Pacific for a great portion of that time. Fred was associated continuously with Pacific since 1923 and Neal since 1941.

For a 2- or 3-year period immediately preceding 1940, one Walter Wiebenson owned the majority of Pacific's stock, which he had acquired from an estate. During that period he directed the management of Pacific. He had had no prior experience in the lumber

business and under his management the business experienced a marked decline. As a consequence, Wiebenson, during 1939, disposed of his stock and severed his connection with Pacific. Thereupon the business again came under the experienced management of the Tebbs and began to improve.

Pacific's physical assets comprised 12 acres of land and certain buildings thereon in Sumner, Washington, including 6 dry kilns with boiler and facilities appurtenant thereto, planing mill, ripsaw, machinery and equipment, and sorting tables. Pacific did not operate an ordinary sawmill and was not equipped to handle logs.

Following is a statement of Pacific's net sales, net profit before deduction of Federal income tax, percentage of net profit to net sales, earnings after deduction of Federal income taxes, and earnings per share after deduction of Federal income tax for the indicated years:

| Year | Net sales | Net profit before deduction of Federal income tax | Percentage of net profit to net sales | Earnings after deduction of Federal income tax | Earnings per share after deduction of Federal income tax |
|---|---|---|---|---|---|
| 1940 | $420, 705. 68 | $3, 927. 80 | . 93 | $3, 927. 80 | $5. 88 |
| 1941 | 630, 411. 99 | 16, 372. 94 | 2. 59 | 15, 582. 97 | 23. 33 |
| 1942 | 993, 256. 60 | 124, 176. 83 | 12. 50 | 29, 956. 15 | 39. 94 |
| 1943 | 1, 200, 178. 68 | 188, 552. 71 | 15. 71 | 38, 690, 79 | 51. 59 |
| 1944 | 925, 171. 51 | 98, 407. 43 | 10. 63 | 13, 101. 24 | 8. 73 |
| 1945 | 1, 017, 453. 38 | 82, 267. 75 | 8. 09 | 16, 606. 58 | 11. 07 |
| 1946 | 1, 189, 126. 64 | 38, 791. 24 | 3. 26 | 25, 731. 89 | 17. 15 |
| 1947 | 1, 706, 750. 84 | 103, 999. 72 | 6. 09 | 64, 575. 71 | 43. 05 |
| 1948 | 1, 853, 179. 27 | 17, 078. 73 | . 92 | 13, 250. 63 | 8. 83 |
| 1949 | 1, 143, 963. 29 | 3, 949. 51 | . 35 | 3, 120. 11 | 2. 08 |
| 1950 | 1, 496, 569. 79 | 46, 736. 70 | 3. 12 | 31, 694. 09 | 21. 13 |

Pacific paid the following salaries to its officer-stockholders during the indicated years:

| Year | Thomas W. Tebb | Fred R. Tebb | Neal A. Tebb | Total |
|---|---|---|---|---|
| 1940 | $1, 200 | $8, 000. 00 | | $9, 200. 00 |
| 1941 | 14, 903 | 11, 202. 40 | | 26, 105. 40 |
| 1942 | 14, 100 | 10, 100. 00 | $5, 150. 00 | 29, 350. 00 |
| 1943 | 18, 100 | 12, 100. 00 | 7, 300. 00 | 37, 500. 00 |
| 1944 | 18, 100 | 12, 100. 00 | 7, 300. 00 | 37, 500. 00 |
| 1945 | 18, 100 | 12, 000. 00 | 7, 300. 00 | 37, 400. 00 |
| 1946 | 20, 500 | 15, 100. 00 | 10, 900. 00 | 46, 500. 00 |
| 1947 | 22, 030 | 16, 450. 00 | 11, 800. 00 | 50, 280. 00 |
| 1948 | 20, 320 | 16, 900. 00 | 12, 100. 00 | 49, 320. 00 |
| 1949 | 11, 424 | 11, 533. 30 | 8, 266. 70 | 31, 224. 00 |
| 1950 | 3, 300 | 14, 099. 98 | 10, 100. 02 | 27, 500. 00 |
| Total | $162, 077 | $139, 585. 68 | $80, 216. 72 | $381, 879. 40 |

The book value per share of Pacific's stock at the end of indicated years was as follows:

| Year | Asset or book value | Year | Asset or book value |
|---|---|---|---|
| 1940 | $87. 73 | 1946 | $101. 23 |
| 1941 | 119. 21 | 1947 | 116. 47 |
| 1942 | 146. 20 | 1948 | 104. 50 |
| 1943 | 181. 98 | 1949 | 100. 77 |
| 1944 | 99. 31 | 1950 | 111. 39 |
| 1945 | 105. 89 | | |

Following is a statement of the total dividends paid by Pacific, and the rate of return which such dividends represented on outstanding capital invested in the company during the indicated years:

| Year | Total dividends paid | Rate of return (per cent) |
|---|---|---|
| 1940 | (1) | (1) |
| 1941 | (1) | (1) |
| 1942 | $7, 500 | 10 |
| 1943 | 11, 250 | 15 |
| 1944 | 75, 000 | 2 100 |
| 1945 | 22, 500 | 15 |
| 1946 | 31, 500 | 21 |
| 1947 | 40, 500 | 27 |
| 1948 | 30, 000 | 20 |
| 1949 | 7, 500 | 5 |
| 1950 | 15, 000 | 10 |

1 None.

2 In 1944 a stock dividend of 750 shares was declared and paid, making the outstanding stock thereafter 1,500 shares. Of such dividend, $41,066.87 was paid from paid-in surplus and $33,933.13 was paid from earned surplus.

At the time of the decedent's death, June 28, 1950, Pacific's business was well established and had favorable prospects for the future. Prior to decedent's death, as well as since, all of Pacific's stock was held by members of the Tebb family. Pacific's stock was never listed on any exchange, nor quoted for sale through security brokers. There were no arm's-length sales of the stock within recent years.

The 511 shares of stock in Pacific owned by the decedent at the time of his death were reported in the estate tax return by his estate at a fair market value of $100.77 per share. The respondent determined that the stock had a value of $146 per share at the time of the decedent's death.

OPINION.

The valuation of corporate stock which is closely held by members of a single family is a question of fact.

The petitioners selected the book value of the stock at the close of 1949 as the fair market value on the date of decedent's death some 6 months later. We think they have entirely failed to show that such book value should be substituted for the respondent's determination. Reliance solely on the book value of the stock means that such other important relevant factors as the nature and history of the business, the general economic outlook at the valuation date and, most important, the earnings of the business have been ignored. Pacific's earnings in relation to the total stock outstanding were remarkably good. The respondent obviously took that fact, as well as others, into consideration in making his determination of $146 per share. On the basis of the earning record of the company and all the other evidence of record,

we conclude that the respondent did not err in determining the fair market value of Pacific's stock to be $146 per share on the valuation date.

### *Taxability of Shares of Pacific Stock Received by Fred R. and Neal A. Tebb.*

#### FINDINGS OF FACT.

Decedent's first wife, the mother of petitioners Fred R. and Neal A. Tebb, died in 1942 or 1943.

From about 1941 until the end of 1948 or early in 1949 when he became totally inactive in Pacific's management, decedent participated less and less in the conduct of its affairs. Fred, after 1940, and Neal, after 1941, were increasingly active in the control and operation of the company. Decedent, however, until his death, was president of Pacific and received a salary as such.

For some years prior to 1948, decedent had expressed his intention of bequeathing his Pacific stock to his sons, Fred and Neal. During those years, he had executed various wills which provided that the stock should go to them upon his death.

In 1946 or 1947 the decedent contemplated marriage with a woman other than Grace Tebb. Because he wished his sons to have the majority of his Pacific stock and that there would be no dispute with his surviving widow concerning the stock, decedent had a trust instrument prepared in which a bank was named trustee and under the terms of which he would place the 511 shares of stock then owned by him in trust for the benefit of his sons, Fred and Neal, his daughters, Mary R. Tebb and Alice Virginia Kohl, and his daughter-in-law, Ella Reese Tebb. The contemplated marriage was never consummated and the decedent never executed the proposed trust agreement.

Late in 1948, decedent decided to marry Grace Tebb. He discussed his plans with Fred and Neal, and again, for the reasons which prompted the drafting of the aforementioned trust, decedent and his sons executed a letter agreement on December 9, 1948,[2] which provided

---

[2] I am writing this letter as a memorandum of our agreement covering your continued service to the Pacific Lumber Agency and the disposition to be made of my stock in that company at the time of my death.

It is my desire that the two of you continue to serve the Pacific Lumber Agency in your present capacities. I have agreed, therefore, in consideration of your continuing to serve the Pacific Lumber Agency to provide that you shall have certain additional stock in the company at the time of my death.

At the present time I hold 511 shares of the common capital stock of Pacific Lumber Agency, out of which stock I desire to make three minor gifts to my two daughters and my daughter-in-law. Out of such stock at the time of my death I desire to make the following specific gifts:

| | |
|---|---|
| Mary R. Tebb | 6 shares |
| Alice Virginia Kohl | 6 shares |
| Ella Reese Tebb | 39 shares |

The above gifts will bring each to 100 shares.

in essence that decedent wished his sons to continue Pacific's business and that at his death he wished to make gifts of his 511 shares of stock as follows:

| | |
|---|---:|
| Fred R. Tebb | 230 |
| Neal A. Tebb | 230 |
| Mary R. Tebb | 6 |
| Alice Virgina Kohl | 6 |
| Ella Reese Tebb | 39 |
| Total | 511 |

The sons agreed to continue their association with Pacific and decedent agreed to deposit the shares with an attorney, as escrow agent. Decedent also was to retain all voting and dividend rights during his lifetime.

The decedent, prior to his marriage to Grace Tebb on December 15, 1948, endorsed the stock certificates in blank and transferred them to the escrow holder under the letter agreement of December 9, 1948. Fred and Neal continued in the employment of Pacific and rendered faithful and diligent service to it until the decedent's death on June 28,

---

It is my proposal that the remaining 460 shares shall be divided equally between you at the time of my death so that each will receive 230 shares of stock.

All of my stock shall be deposited in escrow with Messrs. Skeel, McKelby, Henke, Evenson & Uhlmann, of Seattle, Washington, to accomplish the purposes of this agreement. I shall execute an endorsement of my stock which will authorize the transfer of the stock in the manner which I have outlined in this letter. Such stock and endorsement shall be held in escrow under the terms of this agreement until my death or the earlier termination of this agreement mutually between us. During my lifetime I shall have the unrestricted right to vote such stock and to receive all dividends declared upon it. Any stock dividends declared upon said stock shall be deposited by me with the escrow agent, suitably endorsed to effect a proportionate transfer as outlined in this agreement, it being my intent that all of the stock in the Pacific Lumber Agency which I may own at the time of my death shall be distributed under this agreement.

I have for convenience provided for a distribution to my two daughters and my daughter-in-law. Such distribution is not, however, a part of this contract and I retain the right and privilege to at any time make any readjustment of such shares as I may desire.

You have obligated yourselves under the terms of this contract to faithfully serve the Pacific Lumber Agency until the time of my death. You shall be entitled to receive compensation for your services at substantially the same rates as are now being paid to you, provided that if the economic conditions of the company should require a reduction of compensation your compensation shall be proportionately reduced with that of the other executives of the company. Likewise, if circumstances should permit any increases the corporation shall thereafter have the privilege of reducing your compensation to the present level without any specific consent on your part.

In the event that either of you should fail to survive me, then the survivor shall be entitled to receive the whole of the 460 shares covered by this agreement, subject to his otherwise faithfully carrying out the terms of this agreement. In the event that either of you should terminate your employment with Pacific Lumber Agency prior to distribution of the stock or should your employment by Pacific Lumber Agency be terminated because of your failure to faithfully and diligently serve such corporation, then you shall have no further right under the terms of this agreement. The failure of either one of you, however, to meet such condition shall not in any way jeopardize the right of the other to receive his 230 shares in the event he faithfully complies with the terms of this agreement.

To complete the record in respect to this agreement, please note your acceptance at the bottom of this letter.

1950. On that date, the escrow holder, in accordance with the agreement, delivered certificates for 230 shares of stock to Fred and certificates for 230 shares to Neal.

Grace Tebb, neither as executrix of the decedent's estate nor as beneficiary of the residuary portion of the estate, made any claim or asserted any title or right to the shares of Pacific stock which Fred and Neal received from the escrow holder. Those shares of stock were not included in the inventory and appraisement of decedent's estate filed in the Superior Court of the State of Washington for Pierce County.

In the inheritance tax return filed by the executrix with the State of Washington for the estate of the decedent, the 511 shares of Pacific stock covered by the agreement of December 9, 1948, were included as a part of the decedent's estate.

In the Federal estate tax return filed for the decedent's estate, the 511 shares of stock were reported as a transfer made during decedent's life and were included as a part of his estate. The following statement was made on the return: "It is conceded that the subject matter of this transfer is taxable in the estate of the decedent." In determining the deficiency in estate tax involved herein, the respondent made no change in the treatment accorded the stock except to determine a value therefor of $146 per share at the time of the decedent's death instead of $100.77 per share at which it was reported on the return.

In determining the deficiencies in income tax for 1950 of Fred R. and Claire F. Tebb and Neal A. and Helen R. Tebb, the respondent determined that the agreement of December 9, 1948, was an enforceable agreement; that the shares of stock in Pacific which Fred and Neal received from the escrow holder were received pursuant to that agreement; that the stock constituted compensation to them and accordingly increased the incomes of Fred and Neal by $33,580 each, representing the value he determined for the 230 shares of Pacific stock which each received.

### OPINION.

Petitioners contend that the transfer of decedent's Pacific stock was a testamentary disposition thereof and that the value of such shares was properly included in the inventory of the estate assets as required by section 811 (c) [3] and, therefore, that the value of such shares is excludible from the income of Fred and Neal under the provisions of

---

[3] SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

section 22 (b) (3).[4]  We think the facts disclosed by the record before us amply support the petitioners' contention.  Decedent, for some years prior to his death, had repeatedly expressed his intention of bequeathing his Pacific stock to Fred and Neal.  So great was his desire that his stock pass to his two sons that he, twice, prepared instruments transferring the shares to them, other than by will, so that there would be no controversy with his surviving widow.  The second of those instruments is the letter agreement by which the shares did pass to Fred and Neal.  But the fact that the shares passed to them by virtue of that agreement, rather than by provision of decedent's will, nonetheless makes the transfer a testamentary disposition of the stock.

Clearly, there was no bona fide sale of the shares for an adequate and full consideration in money or money's worth within the meaning of the statute.  As we noted in *Estate of John M. Goetchius*, 17 T. C. 495, 503 (1951) :

that * * * phrase * * * means that there must be the kind of consideration which in an arm's length business transaction provides the transferor of property with the full value thereof, in exchange; and that if the consideration is not paid in money, property, or services, but is represented by some benefit, then the benefit must be of the *equivalent money value* in order to constitute the required "adequate and full consideration." * * * Accordingly, the exemption from tax is limited to those transfers of property where the transferor or donor has received benefit in full consideration in a genuine arm's length transaction; and the exemption is not to be allowed in a case where there is only contractual

---

(c) TRANSFERS IN CONTEMPLATION OF, OR TAKING EFFECT AT, DEATH.

(1) GENERAL RULE.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise—

\* \* \* \* \* \* \*

(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (i) the possession or enjoyment of, or the right to the income from, the property, or (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; or

(C) intended to take effect in possession or enjoyment at or after his death.

(2) TRANSFER TAKING EFFECT AT DEATH—TRANSFERS PRIOR TO OCTOBER 8, 1949.—An interest in property of which the decedent made a transfer, on or before October 7, 1949, intended to take effect in possession or enjoyment at or after his death shall not be included in his gross estate under paragraph (1) (C) of this subsection unless the decedent has retained a reversionary interest in the property, arising by the express terms of the instrument of transfer and not by operation of law, and the value of such reversionary interest immediately before the death of the decedent exceeds 5 per centum of the value of such property.  For the purposes of this paragraph, the term "reversionary interest" includes a possibility that property transferred by the decedent (A) may return to him or his estate, or (B) may be subject to a power of disposition by him, but such term does not include a possibility that the income alone from such property may return to him or become subject to a power of disposition by him. * * *

[4] SEC. 22.  GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(3) GIFTS, BEQUESTS, DEVISES, AND INHERITANCES.—The value of property acquired by gift, bequest, devise, or inheritance. * * *

consideration but not "adequate and full consideration in money or money's worth." * * *

We can find no arm's-length transaction here, but only decedent's intent to *give* the shares of his stock to his children in such a way that there would be no contest over the ownership of such shares between them and his widow. We therefore conclude that the estate properly included the stock in the inventory of decedent's assets and that respondent erred in determining that the value thereof constituted additional income to Fred and Neal in 1950.

## *Marital Deduction.*

### FINDINGS OF FACT.

Decedent was 79 years of age when he married Grace Tebb, who survived him. On November 18, 1949, the decedent executed a will which provided for the administration and disposition of his estate as follows:

First: I hereby direct the payment of all just debts and funeral expenses.

Second: I give and bequeath to my son Arthur Tebb, the sum of Five Hundred Dollars.

Third: I give and bequeath to my grandchildren, namely, Mollie Kohl, Allan Kohl, Gordon Tebb and Mariella Tebb the sum of Five Hundred Dollars each.

Fourth: I give, devise and bequeath to Ella Tebb [daughter-in-law], the following described real estate situated in Sumner, Pierce County, Washington:

West one half of Lots Six (6) and (7), Block Two (2), Meeker Homestead Tract, an addition to Sumner, Pierce County, Washington, according to plat recorded in Book 13 of plats at page 31.

Fifth: I make no provision or bequest at this time other than remembering with love and affection, my daughters, Alice Kohl and Mary Tebb, and my sons Fred R. Tebb and Neal A. Tebb, for the reason that previous to this time I have dealt amply and justly with them and have provided sufficiently for them, and each of them.

Sixth: All the rest, residue or remainder of my estate, real, personal and mixed of whatsoever kind or nature, and wheresoever situated, of which I may be seized or possessed, including all choses in action and property interests of every kind and nature, I give, devise and bequeath to my wife, Grace Tebb, to have and to hold as her own sole and separate property.

Seventh: I hereby nominate and appoint my said wife, Grace Tebb, as Executrix of this my Last Will and Testament, and I direct that no bond whatever shall be required of her. I further direct that my said Executrix settle and manage my said estate without intervention of any court, other than to have this will admitted to probate, file an inventory and do such other acts and things as by law provided, it being my intention as herein expressed that my said Executrix shall have full power and authority to sell, mortgage, lease, or in any other manner dispose of any or all property of my said estate, and to settle the same as to her shall seem proper, without intervention or order of any court whatsoever.

On July 5, 1950, the decedent's will was admitted to probate in the Superior Court of the State of Washington for Pierce County.

The children of the decedent contemplated contesting his will in court. However, they never instituted any court action because, on December 5, 1950, prior to the expiration of the period for instituting such action, they and Grace Tebb, individually and as executrix of the estate of the decedent, entered into a written agreement settling the controversy between them respecting the will. In consideration of the decedent's children agreeing not to contest the will, Grace Tebb agreed, among other things: (1) That not later than the time of the distribution of the decedent's estate she would pay to Fred R. Tebb and Neal A. Tebb, sons of the decedent, as trustees, the sum of $4,000 to be used as an educational fund for the benefit of Gordon Tebb, Allan Kohl, and Mollie Kohl, grandchildren of the decedent; (2) that she would maintain during her lifetime adequate records of account showing the property she received from the decedent's estate and the disposition she made thereof; (3) that she would not dispose of any part of the property she received from decedent's estate except as might be necessary for her own maintenance, care, and normal living expenses; (4) that during her lifetime she would not dispose of by gift any part of the property she received from the decedent's estate to any person other than to Alice Tebb Kohl, Arthur Tebb, Elizabeth Steen Peterson, Mary R. Tebb, children of decedent, or to Ella Reese Tebb, daughter-in-law of the decedent; (5) that an accounting for the use in the above-mentioned manner of the property she received from the decedent's estate should be a charge upon her estate at the time of her death; and (6) that she would make and maintain a will under the terms of which she would leave in equal portions to Alice Tebb Kohl, Arthur Tebb, Elizabeth Steen Peterson, and Mary R. Tebb, children of the decedent, and Ella Reese Tebb, daughter-in-law of the decedent, or in the event of their death to their issue, all of the property which she, Grace Tebb, should die seized or possessed of and which constituted any portion of the property she had received from the decedent's estate.

On or about January 2, 1951, Grace Tebb, as executrix, filed with the Superior Court of the State of Washington for Pierce County, a petition for approval of the agreement of December 5, 1950, between her and the children of the decedent.

On January 5, 1951, and upon it appearing to the court that the agreement of December 5, 1950, "was voluntarily entered into in order to avoid the contest of that last will and testament" of the decedent "and to provide for the amicable distribution of the assets" of decedent's estate, the court entered an order approving the agreement.

On August 28, 1951, Grace Tebb, as executrix of decedent's estate, filed a Federal estate tax return for the estate in which she took a marital deduction of $36,389.07 as representing the value of the por-

tion of the estate passing to her under the will of the decedent. The respondent disallowed the deduction with the following explanation

The surviving spouse [Grace Tebb] surrendered or assigned the remainder interest in these items [of property on account of which the marital deduction was taken] and therefore received only a life estate from the decedent. It is determined that no interest passed to the surviving spouse which qualifies and is available to be a part of a marital deduction.

### OPINION.

The petitioners take the position that title to the real estate and personal property constituting the residuary portion of the decedent's estate, and on account of which the marital deduction was taken, vested immediately in Grace Tebb upon the death of the decedent and accordingly passed to her under the decedent's will within the meaning of the provisions of section 812 (e) [5] of the Internal Revenue Code of 1939; and that therefore her subsequent action in entering into the agreement of December 5, 1950, with the children of the decedent with respect to such property and by which the will controversy was settled, did not alter the original status of the property under section 812 (e).

The respondent takes the position that Grace Tebb, as a result of the agreement of December 5, 1950, assigned or surrendered to others a remainder interest in the property in question, and therefore acquired only a terminable interest in such property for which no marital deduction is allowable under the provisions of section 812 (e) (1) (B). Pertinent sections of the Code are set forth in the margin.

---

[5] SEC. 812. NET ESTATE.

For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate—

\*        \*        \*        \*        \*        \*        \*

(e) BEQUESTS, ETC., TO SURVIVING SPOUSE.—
  (1) ALLOWANCE OF MARITAL DEDUCTION.—
    (A) In General.—An amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate.
    (B) Life Estate or Other Terminable Interest.—Where, upon the lapse of time, upon the occurrence of an event or contingency, or upon the failure of an event or contingency to occur, such interest passing to the surviving spouse will terminate or fail, no deduction shall be allowed with respect to such interest—
      (i) if an interest in such property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to any person other than such surviving spouse (or the estate of such spouse) ; and
      (ii) if by reason of such passing such person (or his heirs or assigns) may possess or enjoy any part of such property after such termination or failure of the interest so passing to the surviving spouse ;

\*        \*        \*        \*        \*        \*        \*

  (3) DEFINITION.—For the purposes of this subsection an interest in property shall be considered as passing from the decedent to any person if and only if—
    (A) such interest is bequeathed or devised to such person by the decedent ; \* \* \*

Section 812 (e) (1) (A) provides for a marital deduction allowance in an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse. However, subparagraph (B) provides that no deduction shall be allowed where the interest passing to the surviving spouse is a life estate or other terminable interest. If no controversy had arisen with respect to the will of the decedent herein, there would have passed from him to Grace Tebb, as the sole and absolute owner, all interest in the property comprising the residuary portion of his estate with respect to which the marital deduction here involved was taken. But the agreement of December 5, 1950, settling the will contest, provided for a substantially different disposition of the decedent's estate than that provided for in his will. Under the agreement Grace Tebb was required, not later than the time of distribution of the estate, to pay over $4,000 as an educational fund for the benefit of certain of the decedent's grandchildren; to use only such part of the other portion of the residuary estate during her lifetime as was necessary for her normal living expenses; to make no gifts out of that part of the estate except to one or more of the named four children and daughter-in-law of the decedent; and to make and maintain a will by which she would leave in equal portions to the foregoing children and daughter-in-law or, in case of their death, to their issue, all of the property of which she should die seized or possessed which constituted a portion of the property she had received from the decedent's estate.

Regulations 105, section 81.47a (g), provide as follows:

(g) *Will contests.* If as a result of a controversy involving the decedent's will, or involving any bequest or devise thereunder, his surviving spouse assigns or surrenders a property interest in settlement of such controversy, the interest so assigned or surrendered is not considered as having "passed from the decedent to his surviving spouse."

The foregoing provision of the Treasury regulations finds support in the legislative history of section 812 (e). Subsection (e) was added to section 812 by section 361 of the Revenue Act of 1948. The report of the Senate Finance Committee [6] accompanying such Act states:

If the surviving spouse takes under the decedent's will, the interest passing to her is determined from the will * * *. If, as a result of a controversy involving a bequest or devise to the surviving spouse, such spouse assigns or surrenders an interest in property pursuant to a compromise agreement in settlement of such controversy, the amount so assigned or surrendered is not deductible as an interest passing to such spouse. * * *

We think it clear that Congress intended no marital deduction allowance with respect to an interest in property passing by bequest or devise to a surviving spouse, which such spouse in settlement of a controversy with respect thereto, assigned or surrendered to another.

[6] S. Rept. No. 1013 (Part 2), 80th Cong., 2d Sess. (1948), pp. 4, 5.

Under the settlement agreement of December 5, 1950, Grace Tebb irrevocably surrendered an interest having a value of $4,000 in the residuary estate to Fred R. and Neal A. Tebb, as trustees of an educational fund for the grandchildren of the decedent. She further surrendered the entire interest in the balance of the residuary estate remaining after her death. We, therefore, think that the net result of the agreement settling the controversy as to decedent's will was that only a terminable interest, within the meaning of section 812 (e) (1) (B), passed to her from decedent. The respondent therefore properly disallowed the marital deduction claimed. See *Estate of Edward F. Pipe*, 23 T. C. 99 (1954), aff'd. 241 F. 2d 210 (C. A. 2, 1957); and *Estate of Michael Melamid*, 22 T. C. 966 (1954).

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

WITHEY, *J.*, dissents.