JEROME KASS and LENORE KASS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kass v. Commissioner
Docket No. 2717-70.
United States Tax Court
T.C. Memo 1974-50; 1974 Tax Ct. Memo LEXIS 268; 33 T.C.M. (CCH) 239; T.C.M. (RIA) 74050; February 28, 1974, Filed Jules Silk and Harvey N. Shapiro, for the petitioners. Mary Ann Hagan, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined a deficiency of $46,778.74 in petitioners' Federal income tax for the year 1964. The principal issue presented for decision is whether the receipt by petitioner Jerome Kass from his father in 1964 of 24 shares of stock in Trinity Apartments, Inc., constituted compensation for services under section 61(a), Internal Revenue Code of 1954, [1] or a nontaxable gift. If we decide that the *270 shares were received as compensation, then we must determine their value at the time of the transfer and whether the petitioners omitted from their gross income an amount in excess of 25 percent of the amount of gross income reported on their joint Federal income tax return for 1964, so that the six-year, rather than three-year, period for assessment is applicable. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Jerome Kass and Lenore Kass are husband and wife whose legal residence was in Wyncote, Pennsylvania, at the time of filing their petition herein. Their joint Federal income tax return for the taxable year 1964 was filed with the district director of internal revenue *271 at Philadelphia. Jerome Kass will be sometimes referred to herein as "petitioner" since Lenore Kass is a petitioner only because she filed a joint return with her husband. Jerome Kass is the son of Joseph H. Kass and May B. Kass. Joseph Kass entered the real estate business in Philadelphia in 1919. After the depression years, he founded three real estate companies. Joseph H. Kass Co. (Kass Co.) was incorporated in 1933; Trinity Apartments, Inc. (Trinity) was incorporated in 1939; and Twelsans Realty Co. (Twelsans) was incorporated in 1956. May B. Kass became the sole shareholder of Bluebell Realty Co. (Bluebell) in 1943. The petitioner joined Joseph Kass in the real estate business in 1947 at the age of 25. The compensation paid to petitioner over the 13-year period from 1954 through 1966 by his father's realty companies was as follows: Calendar Year
Bluebell Realty Co.
Trinity Apts., Inc.
Joseph H. Kass Co.
Total 1954
$2,912.00
$2,912.00
$5,317.50
$11,141.50
1955
3,328.00
3,328.00
4,780.00
11,436.00
1956
3,710.00
3,710.00
6,364.0 0
13,784.00
1957
3,710.00
4,558.70
6,042.50
14,311.20
1958
3,710.00
3,710.00
8,237.14
15,657.14
1959
3,710.00 3,710.00
10,591.00
18,011.00
1960
3,640.00
5,640.00
7,370.15
16,650.15
1961
3,640.00
5,640.00
5,720.00
15,000 .00
1962
3,640.00
3,640.00
5,720.00
13,000.00
1963
3,640.00
3,640.00
6,020.00
13,300.00
1964
5,710.00
3,710.00
5,830.00
15,250.00
1965
5,640.00
4,180.00
5,720.00
15,540.00
1966
3,640.00
7,180.00
5,720.00
16,540.00
*272 Joseph Kass' salary from Bluebell, Trinity, and Joseph Kass Co., averaged $8,766 annually from 1954 through 1962, inclusively. In 1963 and 1964, he received $2,000 in each year from Bluebell and Trinity combined. Joseph Kass' accountant was Sidney Steinberg (Steinberg) who became responsible for the Kass accounts in 1950. Steinberg handled all of Joseph's financial matters and also served as a consultant regarding the disposition of Joseph's and May's estates. It was Joseph's practice to send copies of his wills to his accountant prior to their execution so that they might be examined by him from a tax standpoint. During April 1952, Steinberg reviewed Joseph's will with him and the two agreed, among other things, that since Joseph's daughters appeared to be amply provided for, Jerome should be given an interest in the Trinity Apartments. In a letter to Joseph's attorney, Henry Arronson, dated April 30, 1952, Steinberg stated that Joseph and he requested Arronson to consider carefully the suggestion that 49 percent of the outstanding stock of Trinity be transferred to Jerome by gift, with the remainder transferable upon Joseph's death. The suggestion was never carried out *273 by Joseph. In October 1955, Joseph asked Steinberg to review his will in light of the new internal revenue provisions and the changes in Joseph's assets. In a report sent to Joseph on November 7, 1955, Steinberg recommended that a new corporation be established and that 50 percent of the shares of stock in that corporation be made the subject of gifts to Jerome by Joseph and May. It was suggested that May make a lifetime gift of 50 percent of her stockholdings in Bluebell to Jerome. Steinberg also recommended that the Trinity stock be retained by Joseph. Trinity was the only family corporation which had a substantial net worth. In rejecting the gift proposals at that time, Joseph explained to Steinberg that Jerome, who was then 33, was somewhat young for stock ownership and that he would take care of Jerome at a later date. During the period from 1955 through 1964, Steinberg had frequent discussions with Joseph in which he urged that Joseph make gifts to his son so as to ease the impact of his eventual estate taxes. Joseph's intention of giving his shares of stock to Jerome was well known to all the members of his family. Since Jerome was active in his father's business *274 and his sisters were well provided for by their husbands, they expected that their father's stock would be left to Jerome. In his wills executed in 1952 and 1959, Joseph provided that Jerome was to receive all of the shares of capital stock in the realty companies owned by Joseph at the time of his death. In his last will and testament, executed on May 5, 1961, Joseph provided that all of his stock in Trinity and Kass was to be held in trust, with income payable currently to Jerome. The will directed that the trust was terminable at Jerome's discretion. The trust provision was placed in the will as a result of the marital difficulties experienced by Jerome and his previous wife in 1960 and 1961, which culminated in a divorce in December 1961. Joseph wished to assure in this was that Jerome's former wife would not be able to obtain any of the stock left to Jerome. Joseph also refrained from making any lifetime gifts to Jerome at this time because of his son's marital difficulties. Jerome assumed increasing responsibility for the family real estate business so that by 1963 he was in complete control of the management of the various corporations. On December 20, 1963, he owned *275 12 percent of the outstanding shares of Kass, .07 percent of the outstanding shares of Twelsans, and 28 percent of the class B common stock of Bluebell. He owned no shares of Trinity. By 1963, Joseph had almost completely retired from the business and rarely went to the office. He would not have been able to take over the active management of the family corporations by December 1963 since he suffered from arteriosclerosis. In frequent discussions with his father, with whom he had a warm and close relationship, Jerome asked Joseph why he was reluctant to give him the shares of stock during his life. Jerome finally realized that Joseph's reluctance to give him the stock was based upon his father's feelings of insecurity, which were partly attributable to a fear that his children would forsake him once property was given to them. In late 1963, Steinberg conducted further discussions with the Kasses on the subject of lifetime gifts. Jerome expressed to Steinberg his impatience over his father's failure to convey the stock to him and informed him that "it was about time that his dad made him some gifts." In the last weeks of December 1963, Joseph and May discussed the disposition *276 of their various properties with Steinberg. May admonished her husband about his procrastination in giving his stock to Jerome and told Joseph that it was time that he did something about his stock or otherwise the decision about a lifetime gift would be continually deferred. On December 20, 1963, May transferred 14 shares of class B common stock of Bluebell to Jerome and 11 shares of stock in the same corporation to her daughters, Marsyl K. Kaufman and Dorothy L. Sloane, in carrying out Steinberg's suggestions that lifetime gifts be made. On December 21, 1963, Jerome married Lenore Forman. Lenore and her brother each owned a 50 percent interest in four corporations which operated burglar alarm servicing and manufacturing businesses in Philadelphia and New York. Lenore's previous husband had managed the Philadelphia office of the business but terminated his employment at the time of their divorce. Lenore had considerable business difficulties with her brother and wanted Jerome to assume full-time activity in the business. She offered Jerome 50 percent of her stock interest in the corporations, which had gross annual profits of approximately $2 million, as an inducement, and *277 exerted considerable pressure on Jerome to leave his father's real estate business to accept the offer. Jerome gave the offer serious consideration and informed Joseph that he was receiving a great amount of pressure from Lenore to accept. Jerome indicated to his father that he did not really wish to leave the real estate business because he enjoyed it and knew that Joseph and May were no longer in a position to run the business. He also stated that he did not wish to place himself in a position of subservience to his wife, as was true of Lenore's previous husband. He reminded his father that the real estate business had been promised to him for many years. Jerome suggested that if his father gave him the stock at that time, he would be in a better position to reject his wife's proposal. Joseph asked Jerome what he would do if the stock was transferred and then Jerome decided after all to work for his wife's business. Jerome answered, "You know that I will never do this. I have told you this already. I have no intention of leaving you." On January 6, 1964, 24 shares of stock in Trinity, representing a 48 percent ownership interest in the corporation, were transferred to *278 Jerome from his father. Prior to signing the share certificates, Joseph asked Steinberg if he was doing the right thing in giving the stock to Jerome. His accountant assured him that they had discussed the transfers on many occasions in the past and that he was doing the right thing. Joseph then proceeded to sign the certificates. Joseph did not manifest to either Steinberg or May much worry that Jerome would leave his real estate business and work for Lenore. On the same date, May Kass transferred 13 shares of class A common stock of Bluebell to Jerome and 10 shares of stock in the same corporation to her two daughters. On April 18, 1964, Jerome and his two sisters signed an agreement acknowledging their gifts of stock as being in unequal amounts and agreeing that the gifts would not be considered to be advancements or loans made to them in anticipation of their distributive shares of their parents' estates. The document expressed the recognition on the part of the children that "there was no compelling reason" or moral obligation on the part of the parents to make gifts to the children or otherwise provide for them. After the transfers, Jerome neither assumed greater responsibility *279 in the real estate business nor did he receive increased compensation as a result. Joseph Kass died on November 10, 1964. The death certificate indicated that a significant condition which contributed to the death, but which was not related to the immediate cause of death, was Parkinson's disease.All of the shares of stock owned by Joseph were placed in trust for Jerome pursuant to the terms of his will. On May 20, 1965, the trust was terminated by Jerome. A Federal gift tax return for the taxable year 1964 was filed for Joseph's estate on April 12, 1965, which declared a gift in the amount of $73,328.88 representing the 24 shares of Trinity transferred to Jerome as based upon a valuation of $3,055.37 per share. A gift tax of $3,086.33 was paid by the estate. A claim for refund of the gift tax paid was never filed by the estate. During the examination of the estate tax return of Joseph Kass, the office of the district director of internal revenue, Philadelphia, proposed the inclusion of the transfer of the 24 shares of Trinity stock to Jerome in the gross estate of Joseph as a transfer in contemplation of death. Affidavits of Jerome Kass, Lenore Kass and Sidney Steinberg, *280 signed in March 1968, were submitted to the Internal Revenue Service in connection with this proposal. After submission of the affidavits, and upon consideration by the appellate division, the Internal Revenue Service conceded that the shares of stock should not be included in the estate of Joseph H. Kass as made in contemplation of death. The affidavit submitted by Jerome, signed on March 15, 1968, indicated that Jerome had become dissatisfied with his lack of stock ownership in his father's companies. At the same time, it stated his new wife was anxious for him to exercise her one-half ownership in the burglar alarm businesses and offered him a 25 percent interest in her corporations if he would devote his full-time to the business. In the document, which attempted to ascribe a lifetime motive for the gifts of Joseph, Jerome explained: Frankly, the offer was extremely attractive to me as it was the type of business that had tremedous potential if managed properly. She exerted considerable pressure on me to leave my father's real estate business to accept her offer. Naturally, I had strong family ties, but after much consideration the pivotal question became ownership *281 interest in my father's corporations, which would of course affect my future. Because of this, I decided that I would remain with him only if I was given an adequate stock interest, and after much thought I discussed this with him personally. My father offered me 24 shares of the stock of Trinity Place, Inc., which represented a 48% interest in that company. The offer was conditional upon my remaining in the employ of the various corporations. I considered the offered stock an adequate equity interest, and, therefore, elected to remain with my father. I made this decision notwithstanding the knowledge that my wife would be disappointed. The stock of Trinity Place was transferred to me on January 6, 1964. As a result of this transfer, I continued in my employment as manager of my father's businesses. In his affidavit submitted to the Internal Revenue Service, which was signed on March 28, 1968, Steinberg, who along with Jerome was the co-executor of Joseph's estate, explained: Jerry and I discussed the relative merits of his employment with his father's corporations and the offered position. Jerry's lack of stock ownership in the corporations was considered as a negative *282 factor. Jerry informed his father of the position he had been offered and that he was giving it serious consideration. It was clear that Jerry considered ownership of stock as a pivotal question. Jerry stated that if he were given an adequate interest in the corporations, he would be inclined to remain as manager of his father's companies and to decline the offered position with Owl Protective Agency.
The outcome of the discussions was the transfer to Jerry of approximately 48% of the decedent's stock interest in Trinity Place, Inc. The specific purpose of the transfer was the retention of Jerry's services as manager of the businesses. Jerry was satisfied with this stock interest that he was given and, therefore, declined the offered position with Owl Protective Agency. He remained as the manager of the decedent's business interests, a position he still holds. The value of the 24 shares of Trinity stock received by Jerome was not included in the gross income reported in the petitioners' Federal income tax return filed for the year 1964. In the notice of deficiency mailed to the petitioners on February 19, 1970, after the three-year period of limitations for assessment *283 and collection of a deficiency had expired, the respondent determined that, upon the receipt of the 24 shares of stock, Jerome "realized income as compensation for services in the amount of $81,718.32 under section 61(a), which was not reported on [his] income tax return." ULTIMATE FINDING The transfer of the 24 shares of stock in Trinity Apartments, Inc., in 1964 by Joseph Kass to the petitioner was a gift and not compensation for services. OPINION The main issue confronting us in factual, and the parties agree that the answer depends upon the dominant reason for Joseph's action when he transferred the 24 shares of stock in Trinity Apartments to his son, the petitioner in this proceeding. In Commissioner v. Duberstein, 363 U.S. 278 (1960), the Supreme Court stressed the dominant importance of factual inquiry in determining whether a particular transfer is an excludable gift or taxable compensation. It is equally clear that a case-by-case approach is required in this area of the law. Smith v. Commissioner, 305 F.2d 778, 780 (C.A. 3, 1962). Respondent contends that Joseph's dominant motivation in transferring the stock to his son was to retain *284 him as manager of the realty corporations which Joseph had founded. [3] Petitioner argues that the stock was transferred to him as a gift and therefore is properly excludable from gross income under section 102(a). [4] He relies principally upon our opinion in Estate of Thomas W. Tebb, 27 T.C. 671 (1957), acq. 1957-1 C.B. 5. The statutory notice of deficiency was mailed to the petitioner more than three years after the filing of his 1964 income tax return. The respondent therefore has the burden of proving *285 that more than 25 percent of the gross income reported on the return has been omitted. See section 6501(e) (1) (A); Philipp Bros. Chemicals, Inc. (Md. ), 52 T.C. 240, 254 (1969). In our opinion he has failed to carry that burden. Certain significant facts emerge from our attempt to determine Joseph's intentions at the time of making the transfers to his son. It was always Joseph's well known intention that his son would eventually receive all of his shares of stock in the realty corporations. In wills executed in 1952 and 1959 and in his last will and testament, executed in 1961, Joseph provided that Jerome would receive all of the stock he owned at the time of his death. Jerome had joined his father in the business while he was in his twenties, and the two worked very closely together and exhibited a warm and trusting relationship. By 1963, Joseph rarely came to the office and Jerome was in complete control of the management of the various corporations, although he possessed only a negligible amount of stock in the corporations. Throughout the 1950s, Joseph's tax adviser had strongly recommended that inter vivos gifts of stock be made to Jerome so that Joseph *286 would reduce his estate taxes. This suggestion was rejected by Joseph because of an underlying insecurity and a fear that his children would leave him destitute if he disposed of his property during his lifetime. Even though Joseph trusted Jerome, he was reluctant to give his son stock in his corporation. Ostensibly, Jerome's youth and marital problems militated against Joseph making any gifts of stock to him prior to 1961, the year in which Jerome was divorced from his first wife. Respondent's case has been built upon the affidavits of Jerome, his wife, and Joseph's accountant. These affidavits were prepared in response to an audit of Joseph's estate in which the Commissioner raised the specter that the gift of 24 shares of stock would be included in Joseph's estate as a gift in contemplation of death. In his affidavit, which was submitted to the Commissioner in March 1968, Jerome explained that his new wife, Lenore, exerted considerable pressure on him to leave his father's real estate business so that he could assist her in managing the security alarm business. He stated that the "pivotal question" as to whether he would accept her offer was dependent upon his obtaining stock *287 ownership in the Kass corporations and that he would remain with his father only if he were given an adequate stock interest. He said that he discussed Lenore's offer with Joseph and that he was offered 24 shares of Trinity, which was conditional upon his remaining employed by the various corporations. Since he considered the offered stock to be an adequate equity interest, he chose to remain with his father. Upon the submission of the affidavits, the contemplation of death issue was conceded by the Commissioner. We think the respondent's strong reliance upon the affidavits is misplaced. While Jerome did not dispute the accuracy of his previous statements when he testified before this Court, he asserted that his affidavit lacked "embellishment." While we do not condone a taxpayer's attempt to whipsaw the Commissioner by taking inconsistent positions with respect to the same factual situation, we must nevertheless take an independent view of the matter without according any deference to the Commissioner's concession on the contemplation of death issue which is not before us. After hearing the uncontroverted and credible testimony of the petitioner and his witnesses, we are persuaded *288 that the affidavits represented only self-serving attempts on the part of the affiants to ascribe lifetime motives to Joseph Kass' transfer of the stock. Walter H. Kaltreider, 28 T.C. 121, 126 (1957), affd. 255 F.2d 833 (C.A. 3, 1958). See, e.g., Estate of Oliver Johnson, 10 T.C. 680, 688 (1948). The attempts were so successful that the Commissioner was prompted to include the value of the shares in the gross income of the petitioner as compensation. In any event, we think the affidavits shed no direct light on the donor's intention, which is our single important inquiry herein. While stock ownership may have been the "pivotal question" for Jerome, it is our view that Lenore's pressures simply presented Joseph the occasion to finally make the long discussed and much procrastinated gifts to Jerome. The "embellishments" by Jerome and the other witnesses support our conclusion that the transfer of stock was, in part, motivated by Joseph's desire to avoid estate taxes and was made as a substitute for a testamentary disposition of the stock to Jerome, which, of course, do not negate the requisite "detached and disinterested generosity" bespeaking *289 a gift. See section 20.2035-1(c), Estate Tax Regs. Jerome testified that he did not try to influence his father to transfer the stock. Keeping in mind the close relationship which existed between them, we find it entirely believable that Jerome related his predicament to his father and asked him for the stock so that he would possess some leverage in resisting Lenore's pressures rather than offering him an ultimatum as the respondent urges. It is apparent to us that Joseph considered Jerome's entreaty as of the same kin as Steinberg's oft-expressed suggestions that Joseph deplete his estate by means of lifetime gifts. The gift of stock was not prompted by a fear on the part of Joseph that Jerome would leave the business.Both Joseph's wife and his accountant testified that Joseph did not manifest to them any fear that Jerome would leave the realty business. Instead, it appears that any concern on Joseph's part that Jerome would leave the business arose as a result of the prospect of transferring the stock to Jerome. This is indicative that Joseph never really intended or expected that the stock would serve as an inducement for Jerome to remain in the business. Furthermore, *290 we are convinced that Joseph would not have displayed such indecisiveness to Steinberg moments prior to signing the share certificates had he been dominantly motivated to retain Jerome in the business. He would have done what was necessary with much less hesitancy. It is quite clear that the indecisiveness stemmed from Joseph's fear of the possible detrimental effects the lifetime transfer might have on him personally. It is obvious that such concern, as manifested by Joseph in the days prior to the transfer, nullified any possible incentive of anticipated benefit. See Bogardus v. Commissioner, 302 U.S. 34, 41 (1937). Respondent's position becomes even less tenable when the possible anticipated benefits to Joseph are seriously scrutinized. If Joseph was desirous of protecting his stock investment of $170,000, he could have secured able managers to conduct the business as a replacement for Jerome without disposing of stock worth between $70,000 and $80,000. He also had the alternative of selling the business, which would have been more immediately advantageous to him. We can reasonably assume that Joseph had been apprised of these alternatives by his financial *291 adviser. The single benefit immediately accruing to Joseph was the personal satisfaction experienced by a father that his son now had a substantial stock interest in the companies which the father had founded. It may be argued that Joseph's transfer of shares was not sufficiently disinterested in that the gift was conditioned upon Jerome's remaining as an employee of the corporations. However, we have not found that the gift was in fact a conditional gift. No legally enforceable condition was imposed upon the transfer nor was such a condition accepted by Jerome. We believe that Joseph merely expressed the fact that he would be displeased if Jerome left the business after he had received the stock. Joseph did not place any restriction on the gift. Jerome's use of the word "conditional" in the affidavit was obviously self-serving and his adherence to the term at trial can be explained as an effort on his part, apparent throughout his testimony, to avoid repudiating what he had previously sworn to and submitted to the Commissioner. In Estate of Thomas W. Tebb, 27 T.C. 671 (1957), we were confronted with a definite condition precedent affixed to the gift of stock *292 by a donor to his two sons. Prior to his marriage, the decedent had endorsed stock certificates in blank and transferred them to an escrow holder. A letter agreement executed by the parties provided that the stock was to be delivered to the two sons at the donor's death on the condition that the sons remained in the employ of the father's business. The agreement provided in pertinent part: It is my desire that the two of you continue to serve the Pacific Lumber Agency in your present capacities. I have agreed, therefore, in consideration of your continuing to serve the Pacific Lumber Agency to provide that you shall have certain additional stock in the company at the time of my death. * * * You have obligated yourselves under the terms of this contract to faithfully serve the Pacific Lumber Agency until the time of my death. * * * * * * In the event that either of you should terminate your employment with Pacific Lumber Agency prior to distribution of the stock or should your employment with Pacific Lumber Agency be terminated because of your failure to faithfully and diligently serve such corporation, then you shall have no further right under the terms of this agreement. *293 [Emphasis added; 27 T.C. at 676, 677.] The sons rendered service to the business until the father's death and the shares were thereupon transferred to them. We decided in the Tebb case that the stock was includable in the decedent father's estate and that a testamentary disposition of the shares had been effected at his death even though the shares actually passed to them by virtue of the agreement outside the will. The Commissioner had asserted that the agreement was legally enforceable and that the shares constituted compensation to them pursuant to the agreement. We found, contrariwise, that the agreement was not a genuine arm's length transaction and that there had been on bona fide sale of the shares for an adequate and full consideration so that the transfer was, therefore, a gift in contemplation of or taking effect at death under section 811(c) of the 1939 Code, which is the predecessor of present sections 2035 and 2036. Quoting Estate of John M. Goetchius, 17 T.C. 495, 503 (1951), our holding in Tebb was based upon the fact that the transferor had received no benefit, even though the sons continued to work in the business until their *294 father's death, as full consideration for his shares in an arm's length business transaction (27 T.C. at 679). While the Estate of Thomas W. Tebb is not controlling since we are required to adopt a case-by-case approach, we nevertheless find a basic thread running through both cases. In both cases the donor-fathers wanted their sons to obtain a majority of stock so that they could continue operating the business. In both cases the fathers had expressed a strong desire that their stock would pass to the sons by means of the execution of trust agreements or wills previous to the transfer. While the decedent in Tebb wished to give the shares of stock to his sons in such manner that a contest over their ownership would never develop between them and his new wife, Joseph's dominant motives were to give away his shares to his son so as to avoid estate taxes and to allow Jerome to carry on the family business in terms of ownership as well as operation. Jerome was the natural object of Joseph's affection, one who possessed a particularly close relationship with him, and one who had spent 17 years in the business with his father while attaining increasing responsibility *295 and control over its operation. The gift of the stock during Joseph's lifetime rather than upon his death did not impinge upon this dominant intention and suddenly transform what had always been intended as a gift into compensation. Respondent has not met his burden of proving that such was the case. It therefore follows from our conclusion with respect to the primary issue that the notice of deficiency mailed to the petitioners on February 19, 1970, was barred by the three-year statute of limitations on assessment of the tax. Section 6501(a).Consequently, it is not necessary for us to consider the alternative issues relating to the valuation of the stock transferred and the applicability of the income averaging provisions. Decision will be entered for the petitioners. Footnotes
1. All section references are to the provisions of the Internal Revenue Code of 1954 in effect during the taxable year in issue unless otherwise indicated. ↩
2. The parties have stipulated that the petitioners may take advantage of the income averaging provisions of the Internal Revenue Code in the computation under Rule 155 if we hold for the respondent. ↩
3. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; ↩
4. SEC. 102. GIFTS AND INHERITANCES. (a) General Rule. - Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance. ↩