Sam F. McIntosh and Nancy S. McIntosh v. Commissioner. William M. McIntosh, Jr. and Thanetta McIntosh v. Commissioner.
McIntosh v. Commissioner
Docket Nos. 2529-65, 2530-65.
United States Tax Court
T.C. Memo 1967-230; 1967 Tax Ct. Memo LEXIS 31; 26 T.C.M. (CCH) 1164; T.C.M. (RIA) 67230; November 17, 1967
*31 1. Held, except for one share of stock of subchapter S corporation in which Sam McIntosh had a basis of $200, petitioners had no basis in their shares of stock of, or in any indebtedness owed to them by, the subchapter S corporation as of March 31, 1959; consequently, petitioners are not entitled to deduct their pro rata shares of the net operating loss of the company for its fiscal year ending March 31, 1959, except to the extent of the $200 mentioned above. 2. Non-negotiable notes received by Sam McIntosh in year of sale of his stock in corporation, which were not payable until subsequent years, were not intended as payment for the stock, but only as evidence of the indebtedness due therefor, and the fair market value of the notes was not an amount realized in exchange for the stock and is not includable in Sam's income for the year of sale. Howell C. Mette, 6th Floor, 400 N. Third St., Harrisburg, Pa., for the petitioners. Stephen P. Cadden, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in the income tax of Sam F. McIntosh and his wife, Nancy, for the year 1959 in the amount of $29,596.23. Respondent also *32 determined a deficiency in the income tax of William F. McIntosh, Jr., and his wife, Thanetta, for the year 1959 in the amount of $2,908. At issue in both dockets is petitioners' basis in stock of, and indebtedness owing them by, McIntosh Road Materials Co. for purposes of determining petitioners' allowable deductions for the net operating loss of that company, a subchapter S corporation. Sam F. and Nancy McIntosh have raised the additional issue of whether income was properly reported in 1959 from certain notes received with respect to stock sold during that year. Findings of Fact The stipulated facts are found as stipulated. Petitioners Sam F. McIntosh and Nancy S. McIntosh (hereafter referred to as Sam and Nancy) are husband and wife and presently reside in Harrisburg, Pa. Sam and Nancy filed a timely joint income tax return for the calendar year 1959 with the district director of internal revenue at Philadelphia, Pa. Petitioners William M. McIntosh, Jr., and Thanetta McIntosh (hereafter referred to as William, Jr., and Thanetta) are husband and wife and presently reside in Decatur, Ga. William, Jr., and Thanetta filed a timely joint income tax return for the calendar year 1959 *33 with the district director of internal revenue at Philadelphia, Pa. All petitioners reported their income for the calendar year 1959 on the cash receipts and disbursements method. McIntosh Road Materials Co. (hereafter referred to as McIntosh Co.) is a Pennsylvania corporation organized May 1, 1949. During all relevant periods, the company's principal place of business was Harrisburg, Pa. McIntosh Co. was organized by William M. McIntosh, Sr. (hereafter referred to as William, Sr.), the father of Sam and William, Jr., for the purpose of selling and applying road materials. Sam began working for McIntosh Co. in 1950 and William, Jr., did so in 1953. Throughout McIntosh Co.'s fiscal year April 1, 1958, through March 31, 1959 (hereafter referred to as fiscal year 1959), the company's 1,000 issued and outstanding shares of $10-par-value common stock were held as follows: Number of
shares
Sam (president)
550
William, Jr. (vice-president)
400
Jack D. Murphy (secretary-treas-
urer) [1]
50
The above individuals became owners of this stock under the circumstances hereinafter related. *34 With the exception respecting two shares of stock acquired by Sam hereinafter mentioned, neither Sam nor William, Jr., paid any money for their shares of McIntosh Co. stock owned by them as of March 31, 1959, and neither of them made any actual cash contributions to the company. For its fiscal year 1959, McIntosh Co. qualified as a small business corporation under the provisions of subchapter S of the Internal Revenue Code of 1954. All of McIntosh Co.'s shareholders made valid elections to have the company file returns under subchapter S for the fiscal year 1959. For its fiscal year 1959, McIntosh Co. had a net operating loss of $118,848.71. This net operating loss is claimed by petitioners, and denied by respondent, to be allocable among the shareholders as follows: Amount
Sam
$65,366.79
William, Jr.
31,539.48 [2]
Murphy
5,942.44
On their return for 1959, Sam and Nancy reported taxable income in the amount of $4,619.32. *35 Respondent determined that their correct taxable income was $69,986.11, on the grounds that the deduction of $65,366.79 claimed as their pro rata portion of McIntosh Co.'s net operating loss for the fiscal year 1959 was not allowable. On their return for 1959, William, Jr., and Thanetta reported no taxable income and a loss in the amount of $18,912.79. Respondent determined that their correct taxable income was $12,626.69, on the grounds that the deduction of $31,539.48 [2] claimed as their pro rata portion of McIntosh Co.'s net operating loss for the fiscal year 1959 was not allowable. At the time McIntosh Co. was incorporated in 1949, William, Sr., received 998 shares of the 1,000 shares issued. One share was issued to the wife of William, Sr., and one share was issued to an associate, William Vail. William, Sr., died on August 4, 1954. At that time William, Sr., resided in Miami, Fla., and was a domiciliary of the State of Florida. At the time of their father's death, Sam and William, Jr., lived in Harrisburg, Pa. At the time of his death, William, Sr., owned 998 shares of stock in McIntosh Co. As of July 31, 1954, William, Sr. , had made advances to McIntosh Co. in the amount of *36 $64,735.87, which was reflected on the balance sheet of the corporation as of July 31, 1954, as a liability for advances from officers. Shortly after the death of William, Sr., his widow, Helene A. McIntosh (apparently the third wife of William, Sr., and hereafter referred to as Helene), suggested the possibility that Sam and William, Jr., might be interested in acquiring the interest of William, Sr., in McIntosh Co. On August 25, 1954, John A. Bouvier, Jr., an attorney who was then representing Helene, wrote to Henry E. Harner, an attorney who was representing Sam, as follows: In discussing the general situation with Mrs. McIntosh she feels that the sons are interested in the Harrisburg business. She is agreeable to discussing a possible voluntary agreement by all heirs of Mr. McIntosh toward the end of making it possible for the sons to have the Harrisburg business. I suggest that you call them in and see if they have any thoughts along this line and if so, what proposal can be made for a voluntary division of the property left by Mr. McIntosh. Harner replied to Bouvier by letter dated August 31, 1954, as follows: Following the suggestion in your letter to me dated August 25th, I *37 spoke to Mr. McIntosh's sons about the possibility of a voluntary agreement by all heirs with the idea in mind that the sons might obtain the Harrisburg business. They are interested in taking over the business and are hopeful that some such agreement can be worked out. However, in order to lay the basis for some mutually satisfactory agreement, we would like to be advised as to the several assets constituting Mr. McIntosh's estate and their respective values. We would also like you to advise us what the respective interests of his widow and sons are under Florida law. By a will dated October 2, 1930, William, Sr., provided as to the residue of his estate a life estate for his second wife, Carmen McIntosh, from whom he was divorced at the time of his death, and the remainder to be divided equally among his children, William, Jr., and Sam. Since the widow of William, Sr., was entitled under Florida law to a one-third interest in his real and personal property, however, the residue of his estate was to be divided in equal shares among Helene, Sam, and William, Jr. On or about June 16, 1955, Letters of Administration, Cum Testamento Annexo, were issued to Helene by the County Judge's *38 Court in and for Dade County, Florida. Sam and William, Jr., had no official capacity in the administration of their father's estate, other than as heirs. Helene filed an inventory of the estate on June 16, 1955. In that inventory the McIntosh Co. stock which had been owned by William, Sr., was valued at $65,000. The advances which William, Sr., had made to the company were not mentioned in the inventory. On November 2, 1955, Helene filed a Federal estate tax return for the estate of William, Sr., reporting a gross estate in the amount of $159,001.04. On that return the McIntosh Co. stock which William, Sr., had owned was valued at zero. The advances to McIntosh Co. by William, Sr., were not mentioned in the estate tax return. The estate tax return was prepared by Edwin W. Trively (hereafter referred to as Trively), a reputable and experienced certified public accountant. At all times here relevant, including the date of the trial, Trively resided in Harrisburg, Pa. Trively was the accountant for McIntosh Co. and William, Sr., when he was living. Both Sam and William, Jr., have had occasion to use Trively's services since the death of their father. Trively did not consult with Sam *39 or William, Jr., in the preparation of the estate tax return, nor did the sons see the return as prepared by Trively. Neither Sam nor William, Jr., knew that the indebtedness of McIntosh Co. to William, Sr., was not reflected in the estate tax return. Both sons knew that the McIntosh Co. stock had been valued at zero in the return, which they understood to be the book value of the stock. The sons were not aware that the stock should have been valued for purposes of the estate tax return at its fair market value rather than its book value. Neither Sam nor William, Jr., paid Trively anything for his services in connection with the preparation of the estate tax return. Trively was paid by the estate. On November 7, 1955, an order was issued in the County Judge's Court in and for Dade County, Florida, approving a stipulation dated September 21, 1955, between Helene, Sam, and William, Jr., concerning the distribution of the residue of the estate of William, Sr. The relevant portions of that stipulation are quoted below. Helene is referred to in the stipulation as the party of the first part and Sam and William, Jr., as parties of the second part. 1. Parties of the second part shall receive *40 all of the stock of the deceased testator consisting of 998 shares and all of the stock of Helene McIntosh consisting of 1 share McIntosh Road Materials Co., inventoried at no value; the real estate in Dauphin County, Pennsylvania, at an inventory value of $23,500.00 subject to a mortgage of $30,000.00 existing at the time of deceased testator's death, which said mortgage, upon execution and delivery of proper deed, they, the parties of the second part, will assume and agree to pay; an assignment to the second parties of the corporation's unsecured indebtedness to William Morgan McIntosh, deceased, carried on the corporation books at $64,735.87. 2. Party of the first part is to receive for her interest in the property to be conveyed to the parties of the second part under the foregoing paragraph numbered 1, the proceeds from the sale of the Southern Fuel Oil, Inc. stock, which proceeds of sale have been inventoried at $26,472.00, * * * For a further consideration for the transfer of the property to the parties of the second part, referred to and described in paragraph number 1, party of the first part is to receive a 1954 Ford automobile owned by McIntosh Road Materials Company. 3. *41 All of the rest, residue, and remainder of the assets of the estate of William Morgan McIntosh, deceased, not included and described in paragraphs numbered 1 and 2 above, shall be divided equally among the parties hereto: to-wit, one-third to Helene A. McIntosh, widow; one-third to Samuel F. McIntosh, and one-third to William M. McIntosh, Jr., after the deduction of all estate and inheritance taxes and other taxes, debts, and administration costs. The stipulation was signed on behalf of Sam and William, Jr., by Henry E. Harner, who had represented the sons during the negotiation of the stipulation. Neither Sam nor William, Jr., went to Florida to participate in those negotiations personally. [3]
The $30,000 mortgage to which the Dauphin County real estate was subject was also secured by some equipment and other chattels *42 owned by McIntosh Co. The mortgage had been negotiated by William, Sr., as part of his financial arrangements involving McIntosh Co. The appraised value of the real estate of $23,500 was accepted by Sam and William, Jr., as the fair market value of the property for purposes of negotiating the distribution of the residue of their father's estate. The 998 shares of McIntosh Co. stock and the real estate, totaling 51.75 acres, in Dauphin County, Pa., were subsequently divided and transferred by Sam and William, Jr., as follows: Real estate:
Acres
McIntosh Co.
3.94 (Apr. 19, 1957)
Sam and Dorothy Mc-
Intosh [1]
4.48 (June 30, 1956)
Sam and Dorothy Mc-
Intosh
15.37 (Apr. 19, 1957)
William, Jr., and Tha-
netta
27.96 (Apr. 19, 1957)
McIntosh Co. stock:
Shares
Sam
548
William, Jr.
400
Murphy
50
Sam also acquired the 1 share owned by Helene, so that he received a total of 549 shares. At the time McIntosh Co. was incorporated on May 1, 1949, William, Sr., was 57 years of age and had spent a large portion of his life in the petroleum business, particularly as it related to materials used in road construction. The *43 principal product sold by McIntosh Co. at the time of the death of William, Sr., on August 4, 1954, was bituminous road materials, principally asphalt. In some cases the company acted as a broker in the sale of the asphalt; in other cases it applied the asphalt at the construction sites or delivered it to bituminous hot mix plants. The principal customer of the company was the Department of Highways of the Commonwealth of Pennsylvania (hereafter referred to as the Highway Department). In 1950 the bulk of the work of McIntosh Co. consisted of supplying liquid asphalt for the Highway Department's program for the surface treatment of highways. McIntosh Co. was the largest single supplier for the Highway Department's surface treatment program during 1950. Of total contracts awarded for that year of $2,400,000, McIntosh Co. was awarded contracts amounting to $885,000. McIntosh Co. was also interested in the use of liquid asphalt to subseal voids beneath concrete highways. [4] *44 The Highway Department began a subsealing program in 1949. Although McIntosh Co. did very little subsealing work in 1950, it did an increasing amount of subsealing work during each year after 1949. The normal working season for McIntosh Co. was from Paril 15 to November 1 of each year. In 1951, McIntosh Co. was again made the supplier of asphalt for the surface treatment program and did an increasing amount of subsealing work. In that year McIntosh Co. began to ship hot asphalt *45 directly from the refinery to the jobsite. McIntosh Co. was the first company in Pennsylvania and among the first in the industry to adopt this new procedure. Prior to that time the asphalt had been shipped in railroad tank cars from the refinery to a railroad siding. The asphalt had to be reduced to a liquid state by the application of heat to the tank car with tank car heaters and boosters, pumped into tank trailers, and kept hot until delivered to the jobsite. By picking up the asphalt at the refinery early in the morning and delivering it directly to the jobsite in heated, insulated trailers, McIntosh Co. avoided the expensive process of unloading railroad tank cars. Under its contracts with the Highway Department for 1950 and 1951 McIntosh Co. was required to furnish the material and deliver it to the jobsite and to have a man at the site to run the pump. The Highway Department was responsible for furnishing labor for drilling the holes, working the pegs, clean-up and maintenance, and traffic protection. The new procedure of shipping hot asphalt directly from the refinery to the jobsite worked so well in 1951 that McIntosh Co. ordered 11 additional semitrailers and 11 tractors *46 to be delivered in the spring of 1952. The 1952 season was not as successful as had been anticipated, however. The Highway Department advertised for bids in February 1952, but rejected all bids which were received. The Highway Department decided to do its own application work and bought a number of distributors and tank car heaters. McIntosh Co. and others in the industry tried unsuccessfully to have the Highway Department's decision reversed. During the last 2 years of his life, William, Sr., was not very active in the operation of McIntosh Co. William, Sr., participated in the bidding for the 1953 contracts during the winter of 1952 and the early part of 1953, but he did not participate very much in the company's actual operations because he had moved to Florida by the latter part of 1952. William, Sr., did not participate in the company's operations at all during 1954. William, Sr., was paid a salary of $2,000 a month during the period when he was living in Florida and not participating actively in the operations of the company. At the death of William, Sr., and for a period prior thereto, Sam had been actively operating the company. William, Jr., was not very active in the company's *47 operations at that time because he had come to work for the company only after William, Sr., moved to Florida. In 1953 and 1954, after the decision by the Highway Department to do its own application work, McIntosh Co. and other companies in the industry engaged in promotional efforts designed to persuade the Pennsylvania Turnpike Commission (hereafter referred to as the Turnpike Commission) to subseal the turnpike before beginning a planned resurfacing program. Because of the success of its subsealing program, the Highway Department had adopted a policy by that time to subseal all concrete roads before they were resurfaced. By the time William, Sr., died, Sam was confident that the Turnpike Commission would also enter into a complete subsealing program and that McIntosh Co. would obtain a substantial portion of the business involved in that program. During 1955, McIntosh Co. was awarded contracts by the Turnpike Commission for enough work to last through the 1955 and 1956 working seasons. The contracts with the Turnpike Commission required McIntosh Co. to do the complete job, including hole drilling and furnishing labor, materials, and traffic maintenance. In 1957 the Highway Department *48 changed the type of contract it awarded and began to enter contracts similar to those made by the Turnpike Commission which called for the companies to do the complete job. It was the first time that McIntosh Co. had bid for this type of work for the Highway Department. Although the Highway Department awarded a substantial amount of work to McIntosh Co. during 1957, the company's bids were such that it made no money on a lot of the work. The following table shows the gross sales, gross profit, and net income or loss reported in statements prepared for McIntosh Co. by Trively for each accounting period or year from 1950 through the fiscal year ending March 31, 1960: Net income
Period
Gross sales
Gross profit
(loss)
Jan. 1, 1950 - Dec. 31, 1950
$1,141,209
$330,342
$ 15,520
Jan. 1, 1951 - Dec. 31, 1951
1,779,073
342,911
(23,348)
Jan. 1, 1952 - Mar. 31, 1952
149,090
41,554
(2,661)
Apr. 1, 1952 - Mar. 31, 1953
943,626
300,748
(28,527)
Apr. 1, 1953 - Mar. 31, 1954
854,735
263,801
(55,814)
Apr. 1, 1954 - Mar. 31, 1955
1,045,152
358,457
9,469
Apr. 1, 1955 - Mar. 31, 1956
1,110,222
504,287
69,469
Apr. 1, 1956 - Mar. 31, 1957
1,173,445
550,202
37,023
Apr. 1, 1957 - Mar. 31, 1958
1,413,218
140,154
(25,621)
Apr. 1, 1958 - Mar. 31, 1959
1,339,144
354,072
(120,138)
Apr. 1, 1959 - Mar. 31, 1960
1,625,508
518,979
(8,661)
*49 For the 4-month period April 1 through July 31, 1954, the statement prepared by Trively showed gross sales of $372,149, gross profit of $134,175, and net income of $16,917. McIntosh Co. paid no dividends during the period that Sam was associated with the company, which was from sometime in 1950 to August 1960. The following table shows the total assets, total liabilities, and net worth of McIntosh Co. as of the dates indicated. Liabili-
Net Worth
Date
Assets
ties
(Deficit)
Dec. 31, 1950
$187,890
$157,963
$29,927
Dec. 31, 1951
200,788
194,209
6,579
Mar. 31, 1952
219,533
213,733
5,800
Mar. 31, 1953
282,259
304,987
(22,728)
Mar. 31, 1954
206,502
285,044
(78,542)
Mar. 31, 1955
213,090
282,163
(69,073)
Mar. 31, 1956
213,675
178,266
35,409
Mar. 31, 1957
335,704
273,026
62,678
Mar. 31, 1958
415,347
367,136
48,211
Mar. 31, 1959
376,185
448,390
(72,205)
Mar. 31, 1960
437,674
520,823
(83,149)
The following table summarizes the balance sheet of McIntosh Co. prepared by Trively as of July 31, 1954: ASSETS
Total current assets
$176,154.86
Property, plant, and
equipment
Cost
$366,739.24
Less: Depreciation
and amortization
185,196.57
Net book value
181,542.67
Total Assets
$357,697.53
LIABILITIES
Total current liabilities
$248,159.16
Long-term indebtedness
171,162.84
Total Liabilities
$419,322.00
Stockholders' equity
Capital assigned to
shares
$20,000.00
Deficit from operations
(81,624.47)
Total Stockholders' Equity
(61,624.47)
Total Liabilities and Stockholders'
Equity
$357,697.53
*50 On July 31, 1954, McIntosh Co. owned road equipment, including tank car heaters, distributors, trucks, tractors, and trailers, which had cost $318,699.51. The books of the company as of that date showed a depreciation reserve with respect to the road equipment in the amount of $174,575.01. Estimated lives of 4 or 5 years had been used in computing the depreciation of the individual pieces of road equipment. Certain pieces of road equipment were used longer than the estimated lives that had been used in computing depreciation. At the time of the death of William, Sr., the equipment owned by McIntosh Co. was in good or excellent condition. The company had extensive facilities for maintaining its equipment. Authorities of the various States in which the company did business would specify the equipment required for the proposed project, so it was necessary to have the equipment in order to submit bids. Pennsylvania authorities were not concerned with the deficit shown on the company's balance sheets. If the company had the equipment specified in the proposal and a line of credit for the purchase of material, the company could submit a bid and a bond. As far as Sam knew, McIntosh Co. never *51 submitted a financial statement to the Pennsylvania authorities. During the period from 1951 through 1955 prices for new equipment of the type used by McIntosh Co. were increasing. During the period from August 1, 1954, to March 31, 1955, McIntosh Co. sold various pieces of road equipment at a net loss of $2,370.31. During the period from April 1, 1955, to March 31, 1956, the company sold various pieces of equipment at a net gain of $8,940.72. The Federal estate tax return for the estate of William, Sr., which Helene had filed on November 2, 1955, was audited by representatives of the Internal Revenue Service. All information requested by those representatives in connection with the audit was made available by counsel for the estate. Neither Sam nor William, Jr., was requested to supply any information in connection with the audit. The examining officer for the audit was Franklin Raflo (hereafter referred to as Raflo). Raflo investigated the value as of August 4, 1954, of the McIntosh Co. stock owned by William, Sr., which had been returned at no value, and of the advances to the company by William, Sr., which had not been reflected in the return. The following excerpt from Raflo's *52 report would have constituted his testimony on these points if he had been called as a witness in this case: An inspection of the operating statements shows that this road construction company had substantial losses from January 1951 until March 1954. Salaries taken by the decedent, however, averaged around $26,000.00 each year. After making adjustments accordingly, the financial picture was still unfavorable. The operations from January 1, 1951 until July 31, 1954 resulted in a net loss of $29,830 after decreasing the total loss for that period by $63,602 for excessive salaries. The balance sheet as of July 31, 1954 shows a deficit of $61,624.47. No value was ascribed to the capital stock in this corporation and none is recommended. Advances were made by the decedent to this corporation in the amount of $64,735 as of July 31, 1954. This exceeded the deficit by $3,110. The records were not kept on a completed contract basis because of the nature of the work performed and of the contracts of this company. July and August represent the peak period of road construction in Pennsylvania and all existing liabilities could not be determined until the contracts were completed and until the *53 end of the construction season. It is reasonable to conclude that the real deficit would wipe out all advances made by the decedent. The deficit as fo [of] March 31, 1954 was $78,541; and as of March 31, 1955, it was $69,072. No value for this receivable is recommended. During the period between July 31, 1954, and March 31, 1956, petitioners received money from McIntosh Co. which they considered to be repayments of the advances which William, Sr., had made to the company. Petitioners received $4,230.88 in this manner between July 31, 1954, and March 31, 1955, and $24,338.51 in the same manner between April 1, 1955, and March 31, 1956. On or about March 31, 1956, petitioners decided that the remaining balance of the advances in the amount of $36,166.48 should be treated as part of the company's paid-in capital surplus, which was therefore increased to $46,166.48. On February 9, 1956, the stockholders of McIntosh Co. entered into a stock purchase agreement. Pursuant to paragraph 2 of that agreement, the value of the stock was to be stipulated at the end of each fiscal year by an endorsement to the agreement. In the absence of such stipulation the value was to be $1 per share. Under *54 the terms of the agreement, the estate of a deceased shareholder was obligated to sell and the company was obligated to purchase the deceased shareholder's interest in the company at the stipulated value. A shareholder desiring to sell his interest during his lifetime had to offer the stock first to the company at the stipulated value. The corporation had 30 days to accept the offer, and if the offer was not accepted, the shareholder thereafter could sell his stock at the stipulated value or higher without offering it again to the company. The stock purchase agreement was funded with insurance owned by the company on the lives of the individuals. The premiums on the insurance policies were to be paid by the company. The certificates of stock were deposited with the corporation as trustee. Under the terms of the agreement, each stock certificate was to be endorsed with a restriction showing the certificate to be subject to the stock purchase agreement. The agreement was amended in October 1956. The amounts of insurance on the lives of the individual shareholders as of February and October 1956 are shown below: Shareholder
Feb. 1956
Oct. 1956
Sam
$100,000
$100,000
William, Jr.
60,000
60,000
Murphy
20,000
30,000
*55 As amended in October 1956, the agreement contained the following provision: If the proceeds of the life insurance policies on such decedent, described in Schedule A hereof, shall be greater than the value of the stock as fixed herein, the Trustee [McIntosh Co.] shall pay the entire proceeds over to the estate of the decedent, as consideration for said stock, notwithstanding the provisions of paragraph 2 hereof. On April 1, 1959, the value of the McIntosh Co. stock for purposes of paragraph 2 of the stock purchase agreement was set at $100 per share by an endorsement to the agreement. The one share of McIntosh Co. stock which had been issued to William Vail when the company was incorporated was purchased by Sam in about 1956 for $200. In 1959 Sam experienced marital difficulties with his first wife, Dorothy McIntosh (hereinafter referred to as Dorothy). As a result of these difficulties, Dorothy instituted divorce proceedings against Sam and the parties were divorced in October 1959. As part of the divorce Sam and Dorothy entered into an agreement dated October 22, 1959. In that agreement Sam agreed to pay Dorothy for her support $10,000 on November 1, 1959, and 12 annual installments *56 of $7,300 payable on the first day of November in each of the succeeding 12 years. In addition, Sam agreed to pay Dorothy for the support and maintenance of their two children $100 per month until their majority or emancipation. As collateral security for the agreement between Sam and Dorothy, Sam entered into an agreement of trust with Dauphin Deposit Trust Co. of Harrisburg, Pa. (hereafter referred to as Dauphin Deposit). Sam agreed to deposit certain assets with Dauphin Deposit, including a residence and adjacent land and some insurance policies on Sam's life. Another asset which Sam agreed to deposit with Dauphin Deposit under the terms of the trust agreement is described in the following language: All equity which Sam F. McIntosh holds in five hundred fifty (550) shares of stock in McIntosh Road Materials Co. as restricted and defined in a certain agreement and supplemental agreement among the stockholders and the Corporation, * * * it being understood that should said stock restrictive agreements be terminated or dissolved for any reason, Sam F. McIntosh shall transfer to Dauphin Deposit Trust Company as Trustee under this trust instrument said shares of stock. On November 16, *57 1959, an agreement was entered into between the shareholders of McIntosh Co. whereby Sam agreed to sell 545 of his 550 shares of McIntosh Co. stock to William, Jr., Murphy, and L. D. Lambert (hereafter referred to as Lambert). Lambert was a former employee of the Highway Department and had been employed by McIntosh Co. as general superintendent since 1956. Sam received the following items as consideration for his sale of the 545 shares: 1. William, Jr., and Murphy assumed Sam's obligation to repay advances Sam had received from McIntosh Co. in the amount of $45,238.53; 2. A Cadillac sedan valued at $5,534.10; 3. A 1958 Chevrolet convertible valued at $1,663.89; 4. Ohio National Life Insurance Co. policy No. 5876926 with a net cash value of $332.70; 5. National Life Insurance Co. of Vermont policy No. 1082731 with a net cash value of $2,486.56; 6. A 1955 Autocar tractor valued at $3,000; 7. Lambert's judgment note for $9,000, without interest, payable in 26 monthly installments of $335 each commencing January 2, 1960, and a final payment of $290 on March 2, 1962; 8. William, Jr.'s judgment note in the amount of $5,972.11, without interest, payable in 17 monthly installments of $340 *58 each commencing January 2, 1960, and a final payment of $192.11 on June 2, 1961; and 9. Murphy's judgment note in the amount of $24,872.09 without interest payable in accordance with the following schedule: (a) 17 monthly installments of $800, commencing January 2, 1960; (b) 1 installment of $947.89 on June 2, 1961; (c) 8 monthly installments of $1,140, commencing July 2, 1961; and (d) a final payment of $1,204.20 on March 2, 1962. Pursuant to the terms of the agreement of November 16, 1959, Sam delivered 161 shares of McIntosh Co. stock to William, Jr., and 161 shares to Murphy at the time of the settlement. The remaining 223 shares were delivered to Christian V. Graf (hereafter referred to as Graf) to be held by him in escrow. In the absence of defaults on the notes given Sam by Lambert, Murphy, and William, Jr., Graf was to deliver the shares to the purchasers according to the following schedule: Date
Purchaser
Shares
June 15, 1960
Lambert
10
William, Jr.
15
Murphy
19
Dec. 15, 1960
Lambert
10
William, Jr.
15
Murphy
19
June 15, 1961
Lambert
10
William, Jr.
4
Murphy
30
Dec. 15, 1961
Lambert
10
Murphy
34
Mar. 2, 1962
Lambert
10
Murphy
37 In the absence of default on their notes, Lambert, Murphy, and William, Jr., *59 were entitled to exercise the voting power and receive dividends with respect to all of the stock held in escrow by Graf. If the notes were in default for 30 days, Sam was entitled to take possession of the shares remaining in escrow, provided that if Sam should elect to take possession of the shares, he was required to deliver the notes to the respective purchasers. Lambert, Murphy, and William, Jr., each delivered to Sam a nonnegotiable installment note containing a confession of judgment. The three notes were identical except for the amounts and were signed by the respective purchaser individually without the joinder of the purchaser's spouse. William, Jr., Lambert, and Murphy were employed by McIntosh Co. and they intended to pay the installment notes given Sam out of their salaries and dividends from the company. Except for a small pension being received by Lambert, neither Sam nor William, Jr., was aware of any assets or source of income other than McIntosh Co. with which Lambert and Murphy could have paid the notes held by Sam. Sam made no inquiry of his banker as to whether or not the bank would discount the notes. Other than the escrow arrangement, Sam required no collateral *60 for the notes. No independent endorsements of the notes were required. Sam was of the opinion that Lambert and Murphy were men of good repute who met their financial obligations. Sam did not ask for financial statements from the purchasers, nor did he investigate to determine whether or not there were any outstanding judgments against them. On their income tax return for 1959, Sam and Nancy reported the sale of 322 shares of McIntosh Co. stock for a price of $58,255.80, and the sale of 223 shares of McIntosh Co. stock for a price of $39,844.20. The basis used in computing the gain on the sale of each of these blocks of stock was zero. Sam reported the face value of the notes which he had received with respect to the 223 shares of stock on the advice of his accountant, Trively, who prepared the return. When Sam originally approached the purchasers concerning the sale of his interest in McIntosh Co., a tentative purchase price of $150,000 had been set. Ultimately this tentative price was reduced by about $50,000. Although Sam was reluctant to agree to the reduced purchase price, he did so because he was anxious to leave for Alaska where he had a potential business arrangement with Standard *61 Oil Co. of California. Sam's recent divorce and remarriage were also factors in his decision to sell the stock. Immediately after the consummation of the agreement of November 16, 1959, Sam and Nancy left for Anchorage, Alaska, where they had purchased a home. Sam's proposed business venture did not materialize, however, and they returned to Harrisburg in May 1960. A letter dated November 17, 1959, from Norman A. Sheesley, vice president of Dauphin Deposit, to McIntosh Co. contained the following language: This will advise that this institution has been named Trustee under agreement dated October 22, 1959 of the equity which Sam F. McIntosh holds in all his shares of stock in your corporation. It is our understanding that your corporation holds all outstanding shares of stock in the corporation as trustee under a stock-restrictive agreement. We wish to advise you that any transfer of the shares of Sam F. McIntosh can be accomplished only through our offices as trustees in the equity of that stock * * *. By letter dated November 23, 1959, Graf replied to Dauphin Deposit on behalf of McIntosh Co. as follows: Please be advised that, under date of November 16, 1959, Sam F. McIntosh sold *62 545 shares of the 550 shares of common capital stock owned by him in McIntosh Road Materials Company to William M. McIntosh, Jr., Jack D. Murphy and L. D. Lambert. * * * Needless to say, we do not agree with the premise contained in your letter of November 17, 1959 that transfer of the shares of stock in McIntosh Road Materials Company can be accomplished only through your offices. After the exchange of these letters, negotiations took place between the parties in an attempt to resolve the conflict between the rights of Dorothy and Dauphin Deposit under the trust agreement of October 22, 1959, and the rights of the purchasers of Sam's stock under the sales agreement of November 16, 1959. When Sam returned to Harrisburg from Anchorage in May 1960, he made an attempt to reacquire an interest in McIntosh Co. When that attempt did not succeed, Sam began to compete with McIntosh Co. through the medium of a corporation which he had formed in Alaska and which was qualified to do business in Pennsylvania. This competition affected adversely Sam's relations with William, Jr., Murphy, and Lambert. The notes which Sam received from William, Jr., Lambert, and Murphy were paid according to their *63 tenure with respect to the installments due through May 1960. Sam received about $7,200 on the notes through May 1960. In June 1960 the parties began negotiations regarding settling the notes. Sam received no installment payments after May 1960. At that time, Sam continued to own five shares of McIntosh Co. In August 1960, the parties to the trust agreement of October 22, 1959, and the parties to the sale agreement of November 16, 1959, entered into an agreement in settlement of their various claims. Sam canceled the notes he held from William, Jr., Murphy, and Lambert. William, Jr., Murphy, and Lambert gave $2,500 in cash and a judgment note for $5,000 to the trust established by the agreement of October 22, 1959, and Sam received a credit of $3,000 on a note he owed to William, Jr. Dauphin Deposit released Sam's interest in the McIntosh Co. stock from the trust. Sam sold his five remaining shares of McIntosh Co. stock to William, Jr., for $2,000. [5] On October 1, 1960, *64 William, Jr., sold the 600 shares of McIntosh Co. stock which he then owned to Fred Lyons and his associates for $54,000. Fred Lyons was president of Philgite Tar Co. and was experienced in the asphalt business. Murphy and Lambert sold their McIntosh Co. stock to the same purchasers for the same price per share. There was no material change in the financial condition of McIntosh Co. between March 31, 1960, when the company's balance sheet showed a deficit of $83,149, and October 1, 1960, when William, Jr., sold his stock. There were no additions to capital or withdrawals of capital during that period. Shortly after William, Jr., sold his McIntosh Co. stock, the company was reorganized under the provisions of chapter 11 of the Bankruptcy Act. The company did not cease doing business during the reorganization, which was accomplished successfully. At one time Sam met with the creditors' committee with regard to making a proposal for the business. On May 26, 1961, the name of the corporation was changed from McIntosh Road Materials Co. to East Shore Materials Co. On November 12, 1964, the corporation was merged into Baltimore Tar Corp. and is now operated as the East Shore Division of *65 the Baltimore Tar Corp. Ultimate Findings Sam had an adjusted basis of $200 in the stock owned by him in McIntosh Co., and any indebtedness owed to him by the corporation as of the end of the corporation's fiscal year, March 31, 1959. William, Jr., had an adjusted basis of zero in the stock owned by him in McIntosh Co., and any indebtedness owed to him by the corporation as of the end of the corporation's fiscal year, March 31, 1959. Opinion The first issue in this case involves section 1347(c)(2), [6] which is quoted in the margin below. [7] *67 The general effect of section 1374 is to allow shareholders of a corporation which has elected to be subject to subchapter S of the 1954 Code to deduct from their individual gross incomes a pro rata portion of net operating losses sustained by the corporation. [8]Section 1374 (c)(2) provides, though, that a shareholder's pro rata portion of the corporation's net operating loss shall not exceed the sum of (a) the adjusted basis of the shareholder's stock in the corporation and (b) the adjusted basis in any indebtedness of the corporation to the shareholder. The basis in stock and indebtedness is to be determined as of the close of the corporation's *66 taxable year, which in this case is March 31, 1959. It is this limitation in section 1374(c)(2) which gave rise to the present controversy. The parties have stipulated that the corporation had a net operating loss of $118,848.71 for its fiscal year ending March 31, 1959. Respondent determined that petitioners had no basis in the McIntosh Co. stock which they owned during the company's fiscal year 1959. Petitioners contend that their combined basis in the McIntosh Co. stock was not less than $120,000. The parties have stipulated that the only issue before the Court with regard to petitioners' deductions for McIntosh Co.'s net operating loss for its fiscal year 1959 is the amount of petitioners' basis in their stock of, and any indebtedness owed to them by, the company as of March 31, 1959. Of the 550 shares owned by Sam on March 31, 1959, 548 shares were acquired from the estate of William, Sr. All of the 400 shares owned by William, Jr., were acquired from his father's estate. The parties agree that petitioners' *68 basis in the 998 shares acquired from their father's estate is established by the fair market value of the stock on August 4, 1954, when William, Sr., died. See sec. 1014(a). Cf. M. L. Long, 35 B.T.A. 95. Although the parties have not discussed the point, we cannot find that Sam's basis in the other two shares which he owned on March 31, 1959, is dependent upon the fair market value of the McIntosh Co. stock on August 4, 1954. Sam's basis in the one share he acquired from William Vail is established by the $200 purchase price which he paid for it in about 1956. Sec. 1012. Sam's other share was acquired from Helene in connection with the settlement agreement dated September 21, 1955. That share was not "acquired from the decedent" as that term is defined in section 1014(b). Sam acquired that share either by gift or by purchase. In either case, we are unable to determine Sam's basis in the share and must sustain respondent's determination that Sam had no basis in it. Respondent's determination that petitioners had no basis in their McIntosh Co. stock is based principally on section 1.1014-3(a), Income Tax Regs.[9] *70 That regulation provides that the value which is used for purposes of *69 the Federal estate tax return shall be deemed to be the fair market value of the property for purposes of determining the basis prescribed by section 1014. Respondent contends that petitioners had no basis in the McIntosh Co. stock because the return for their father's estate reported the stock at no value and did not report the advances at all. Respondent argues that petitioners are precluded from claiming a higher valuation than that used in the estate tax return, because respondent relied on the estate tax return as filed and the period for collecting additional taxes from the estate has expired. Even if petitioners are not so precluded, respondent argues, they must prove the higher valuation which they claim by clear and convincing evidence, and have failed to do so. Although the language of section 1.1014-3(a), Income Tax Regs., is not inconsistent with the provisions of section 1014, cf. Williams v. Commissioner, 44 F. 2d 467, affirming 15 B.T.A. 227, it has been held on numerous occasions that the estate tax valuation is not conclusive. That valuation creates a prima facie presumption of fact which may be rebutted by convincing evidence by a taxpayer seeking to prove a different value for purposes of establishing the basis to be used in determining the tax consequences of subsequent transactions involving the property acquired from the decedent. McEwan v. Commissioner, 241 F.2d 887, affirming per curiam a Memorandum Opinion of this Court; Elizabeth G. Augustus, 40 B.T.A. 1201, 1208, affd. 118 F. 2d 38, certiorari denied 313 U.S. 585; May Rogers, 31 B.T.A. 994, 1006, affirmed per curiam 107 F. 2d 394; Northport Shores, Inc., 31 B.T.A. 1013, 1017; Anson Evans et al., Trustees, 29 B.T.A. 710; *71 Stella H. McConnell, 29 B.T.A. 32; David Williams, 15 B.T.A. 227, affd. 44 F. 2d 467; Elizabeth J. Bray, 4 B.T.A. 42. We find no basis in the present record for holding that petitioners are precluded, by an estoppel or otherwise, from claiming a higher valuation than that used in the return filed for their father's estate. Respondent's claim that he relied on the estate tax return as filed is belied by the evidence of Raflo's investigation and report. Absent proof that respondent did rely on the return as filed, the Court has refused to find taxpayers precluded from subsequently claiming different values than those used in the estate tax return. May Rogers, supra at 1003-1004; Northport Shores, Inc., supra at 1017-1019. McMillan v. United States, an unreported case ( S.D.W. Va. 1964, 14 A.F.T.R. 2d 5704), which is cited by respondent, may be adequately distinguished by noting that petitioners here had no official capacity in the administration of the estate and did not participate in the filing of the return or the subsequent audit. Cf. Ford v. United States, 276 F. 2d 17 (Ct. Cl. 1960). What we must determine is whether petitioners have produced sufficient evidence to overcome *72 the presumptions established by respondent's determinations and the value used for estate tax purposes that petitioners' McIntosh Co. stock had no fair market value on August 4, 1954. As shown in the findings of fact, there were no sales of McIntosh Co. stock between the time the company was incorporated in 1949 and the death of William, Sr. The first transfer of ownership of any of the stock took place in connection with the distribution of the residue of the estate of William, Sr., pursuant to the stipulation dated September 21, 1955, and the first sale of a significant amount of stock did not occur until 1959 The parties do not contend that there were any sales of the stock which establish what its fair market value was on August 4, 1954. In previous cases where there were no sales from which the fair market value of stock could be determined, numerous factors have been examined in attempting to arrive at a reasonable valuation figure. These factors include, among others, the earnings record of the corporation, the dividends which it has paid, the book value of the stock, the value of the corporation's assets underlying the stock, the history of the company and its position in the *73 industry, the prospects of the company, testimony of expert witnesses, the value of the stock of comparably situated companies, and any other factors which might affect the price which a willing buyer would pay for the stock. Cf. Estate of Harry Stall Leyman, 40 T.C. 100, 119, modified on other grounds 344 F. 2d 763, opinion of the Court of Appeals vacated per curiam 383 U.S. 832; Estate of Thomas W. Tebb, 27 T.C. 671, 675; Mathilde B. Hooper, Administratrix, 41 B.T.A. 114, 129; Kanawha Banking & Trust Co., et al., Executors, 29 B.T.A. 376, 381; Melville Hanscom, et al., Executors, 24 B.T.A. 173, 175; George F. Milton, Jr., Executor, 17 B.T.A. 380, 383; Estate of Jacob Fish, Deceased, 1 B.T.A. 882; sec. 20.2031-2(f), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237, as modified by Rev. Rul. 65-193, 1965-2 C.B. 370; 10 Mertens, Law of Federal Income Taxation, sec. 59.21 et seq., pp. 62-80. The rules to be followed in valuing the McIntosh Co. stock as of August 4, 1954, are stated, in part at least, in the following excerpt from the Court's opinion in Estate of Samuel Want, 29 T.C. 1223, 1246, modified in part and reversed in part on other grounds, 280 F. 2d 777: Here *74 the stock was closely held, was not listed nor dealt in on any exchange, and the only two sales shown by the record (which tend to show little, if any, fair market value for the stock) took place several years before and after the critical date. Therefore, we must consider the fair market value of the stock to be the price which it would obtain in a hypothetical transaction between a hypothetical buyer and a hypothetical seller. As a part of the hypothesis we suppose that the buyer and the seller were each willing, under no compulsion to buy and sell, and both "were aware of the facts" ( James Couzens, 11 B.T.A. 1040, 1162) or were "familiar with the situation" ( George D. Harter Bank, Executor, 38 B.T.A. 387, 396). Therefore, under the facts present in the instant proceedings, we must consider the question of what was the fair market value of the stock as of the critical date upon the assumption that the pertinent facts as to value were known. * * * There is no evidence with respect to some of the factors listed above. We have considered only those factors which petitioners have discussed and those which are related to the evidence on which they rely. Although we recognize that *75 the book value of stock by itself is not a very reliable indication of the fair market value of the stock, cf. Esttae of Thomas W. Tebb, supra; Barber Securities Corporation, 45 B.T.A. 521, 527; Anna S. Richards, 13 B.T.A. 1279, 1283-1284, the logical starting point in examining petitioners' arguments is McIntosh Co.'s balance sheet for July 31, 1954, particularly in view of the fact that the principal thrust of petitioners' argument is that the net worth of the company, adjusted to reflect actual values of the underlying assets, supports their value. That balance sheet shows a net worth deficit of $61,624. The major part of petitioners' efforts in this case consisted of trying to show through various means that that deficit figure was both inaccurate and insignificant for purposes of establishing the fair market value of the company's stock. Petitioners contend that respondent relied solely upon this balance sheet in determining that the stock had no fair market value on August 4, 1954, and that in doing so respondent ignored other factors involved in stock valuation which he was prescribed in section 20.2031-2(f), Estate Tax Regs. In arguing that the deficit shown on the balance *76 sheet for July 31, 1954, was inaccurate, petitioners have discussed certain factors, assigned a value to those factors, and made adjustments to the balance sheet which would produce a net worth for the corporation of $162,828 instead of the deficit of $61,624. Petitioners then reason from the book value of the stock, as represented by their adjusted net worth for the company, that the fair market value of the stock on August 4, 1954, was not less than $120,000. As indicated previously, we can rely on book value only to a limited extent in determining fair market value. Moreover, some of the factors discussed by petitioners do not represent adjustments which may properly be made to the balance sheet, although they might be proper in other contexts. Of the factors which would constitute proper balance sheet adjustments, none has been adequately substantiated by petitioners. Petitioners maintain that the company's road equipment was worth substantially more than the book value shown on July 31, 1954. In support of this position, petitioners rely on the facts that the cost of replacing equipment owned by the company was new equipment was generally increasing and that some equipment was *77 sold at a net gain during the fiscal year ending March 31, 1956, and that the value of the equipment as shown on the books must be adjusted upward by the amount of $63,448 to eliminate excessive depreciation taken on the equipment prior to July 31, 1954. With respect to the first contention above, the fact that the corporation realized gains on the sale of equipment during its fiscal year 1956 is counterbalanced by the fact, which is ignored by petitioners, that equipment was sold at a loss during the period from August 1, 1954, to March 31, 1955. In addition, the fact that the price of new equipment was increasing does not prove that anyone would have paid more than the book value for the used equipment owned by the company. Cf. Donal A. Carty, 38 T.C. 46, 66. Petitioners claim that the road equipment was excessively depreciated on the books, depreciation having been computed on estimated useful lives of 4 and 5 years, whereas the equipment was actually used by the company for a longer period of time. In support of this contention petitioners offered in evidence a schedule reflecting each item of equipment on hand as of July 31, 1954, the date it was acquired, and the period of *78 actual use of each piece of equipment by the company up to the time the document was prepared shortly before the trial. The actual useful life of each piece of equipment was thus determined, and the cost of the item was divided by the years of actual life to determine the so-called actual annual depreciation of that piece of equipment. Depreciation as thus computed up to July 31, 1954, was then subtracted from the cost of the item and the remaining basis of the item as of July 31, 1954, was considered to be its value as of that date. This computation reflected a total remaining value of all the equipment that exceeded its book value by $63,448. We are not satisfied that petitioners' proposed adjustment to McIntosh Co.'s balance sheet for July 31, 1954, to reflect alleged excessive depreciation would be proper even if all the necessary factual elements for such an adjustment had been proved. Cf. Cohn v. United States, 259 F. 2d 371, 377-378. In any event, petitioners have failed to prove either that the rate of depreciation claimed on the books was excessive or that, if so, this would have increased the fair market value of the stock. The determination of the estimated remaining useful *79 life to be used in setting the rate of depreciation which was proper for the earlier year must be made on the basis of "facts known or reasonably ascertainable" as of the prior year. Leonard Refineries, Inc., 11 T.C. 1000, 1007. Petitioners' schedule indicates that no item of equipment on the inventory had been used longer than its estimated useful life per books as of April 1, 1954; and only 6 of approximately 50 pieces had been used longer than their estimated useful lives as of July 31, 1954 - by 1 to 4 months. We cannot tell whether other equipment that had been abandoned prior to July 31, 1954, had been in actual use for periods longer or shorter than the estimated useful life used by the company. We find nothing in the evidence presented by petitioners that convinces us that the company had used an excessive rate of depreciation on its equipment prior to July 31, 1954; [10] or that, as of that date, the actual value of the equipment owned by the company was any greater than its book value; or, especially, that a prospective purchaser of the company's stock would have attributed a value greater than book value to this equipment in deciding what he would pay for the stock. Petitioners' *80 evidence concerning the actual use of the equipment subsequent thereto is not sufficient proof that the depreciation was excessive or that the book value was understated as of August 4, 1954. Cf. Richard F. Smith, 31 T.C. 1. Petitioners next contend that McIntosh Co.'s balance sheet for july 31, 1954, should be adjusted by adding the amount of $63,602, presumably as an asset, which represents the amount of excessive salaries the revenue agent determined had been paid to William, Sr., during the period from January 1, 1951, to July 31, 1954. We doubt that it could be concluded from the evidence presented that agent Raflo actually made a determination that the salaries paid William, Sr., were excessive; this is simply a factor he took into consideration in determining whether any value should be attributed to the McIntosh Co. stock in William, Sr.'s estate. [11] While we might give consideration to this argument in determining the net income of the company to be used for valuation purposes, suffice it to say in this connection *81 that there is no evidence that the company had any claim to any amounts paid to William, Sr., as salary even if they were shown to have been excessive, which they have not been; nor is there any evidence that a prospective buyer of the stock would have considered William, Sr.'s salary excessive. This is clearly not a proper balance sheet adjustment. Petitioners also propose to adjust the company's balance sheet by treating the advances from William, Sr., as equity capital rather than a liability. This adjustment would be more than sufficient to eliminate the deficit shown on the balance sheet, but we have concluded that petitioners have not justified making such an adjustment. We have been unable to find as a fact whether the advances by William, Sr., were loans or contributions to capital. The parties are in hopeless disagreement on this point. [12] *83 The evidence which does exist, however, shows that petitioners have consistently taken the position that the advances represented a liability of the company at the time of their father's death. The necessary implication of this evidence is that petitioners would have *82 treated the advances as a liability of the company during any negotiations with a prospective purchaser of their stock and that petitioners would have required satisfaction of the liability from either the purchaser or the company. In either case, the prospective purchaser would have had to treat the advances as a liability for purposes of determining what he would be willing to pay for the stock. Furthermore, even if the advances were not viewed as a liability, the company had other liabilities which almost equalled the book value of its assets. As discussed previously, there is no evidence that the fair market value of the company's assets was greater than their book value. Consequently, we cannot conclude that a prospective purchaser of the stock would have considered it to have any book or liquidation value. Petitioners make no argument based on capitalizing the past earnings of a corporation, which is a factor quite frequently given considerable weight in valuing the stock of closely held corporations. Estate of Thomas W. Tebb, supra. This is understandable in view of the fact that the net income of the company, as reflected on its income tax returns, was $15,520 for 1950, while for the years 1951, 1952, 1953, and 1954, it reported net losses of $23,348, $2,661, $28,527, and $55,814 respectively. Even if these figures were adjusted to disallow some excessive salaries and depreciation, they would not support a value in the stock as of August 4, 1954. True, the company did show a profit of $16,917 for the period April 1 through July 31, 1954, but the evidence indicates that in all likelihood this figure did not reflect all costs attributable to that income. The net income reported for the entire fiscal year ended March 31, 1955, was $9,469, at which time the accumulated operating loss deficit was $89,072. But petitioners do argue that the company's operating loss carryover *84 deductions to subsequent years had a potential value that a prospective buyer would have taken into consideration. Of course this tax deduction would be of value to the company only if it had taxable income in subsequent years - and as of the valuation date here involved there is little evidence that the prospects of the company were so good as to place much value on this item. It is true that the Turnpike Commission had decided to subseal its highway with hot asphalt before resurfacing, and McIntosh Co. could expect to get some of this work. However, there was no assurance that McIntosh Co.'s bids for this work would be low, or that the Turnpike Commission, like the Highway Department had previously done, would not reject all bids and decide to do this work itself. Furthermore, even if McIntosh Co. was awarded the contracts, there was no assurance that the contracts would be profitable, as evidenced by the losses incurred by McIntosh Co. in 1957 in performing similar work for the Highway Department. Petitioners also argue that based on the values attributed to the assets distributed to Helene in the settlement agreement for distribution of the assets of William, Sr.'s estate between *85 them, the stock they received must have had some value. However, the same settlement agreement acknowledged that the stock distributed to petitioners had no value, and furthermore there is nothing to indicate why 50 shares of the stock was distributed to Murphy if it had much value. Giving consideration to all of petitioners' arguments we are not convinced that petitioners have offered sufficient evidence to overcome the presumptive correctness of respondent's determination that this stock had no fair market value on the date of William Sr.'s death, or to overcome the prima facie evidence of value resulting from the inclusion of this stock in the estate tax return for his estate at zero, or to prove what, if any, the fair market value of the stock might have been on that date. Petitioners do not argue that they had any basis in any indebtedness owed to them by McIntosh Co. as of March 31, 1954. In fact there is no evidence that the company was indebted to them on that date. An argument might be made that when petitioners decided to consider the balance due on the indebtedness from McIntosh Co. to William, Sr., as equity capital in about 1956, they thereby made a contribution to capital *86 which should be added to their basis in their stock. However, there is no evidence concerning this transaction in the record upon which such a conclusion could be reached, and petitioners do not argue the point, so we can give no consideration to it. On the basis of the consideration discussed above, we conclude that William, Jr., had no basis in the McIntosh Co. stock which he owned on March 31, 1959, and that Sam's basis on that date was limited to the $200 which he paid for the share acquired from William Vail. With the exception of the adjustment required to reflect Sam's basis of $200, we approve respondent's determination that section 1374(c)(2) precludes the deductions claimed by petitioners for McIntosh Co. 's net operating loss for its fiscal year 1959. The remaining issue concerns only Sam and Nancy. When Sam, a cash basis taxpayer, sold 545 shares of his McIntosh Co. stock in 1959 he received various items in exchange. Sam reported gain of $58,255.80 on the sale of 322 shares with a zero basis. There is no dispute with respect to this $58,255.80, which consisted of the assumption by William, Jr. and Murphy of Sam's indebtedness to McIntosh Co. and the value of several vehicles *87 and insurance policies which were transfered to Sam. Sam also reported gain of $39,844.20 on the sale of 223 shares with a zero basis. This gain represented the aggregate face value of the notes which Sam had received from Lambert, Murphy, and William, Jr., with respect to the 223 shares which were to be held in escrow by Graf. These notes were payable in installments specified therein, the first installment being due and payable on January 2, 1960. Sam takes the position here that the deferred payments represented by the notes should not have been reported in 1959. Respondent maintains that the full face value of the notes was properly reported in 1959. Sam maintains that non-negotiable notes received by a cash basis taxpayer as evidence of indebtedness are not within the "amount realized" under section 1001(b). [13] Moreover, Sam argues, the notes had no fair market value, because no amounts were payable thereunder until 1960, they were non-negotiable and non-interest bearing, the makers had no assets other than their future salaries from McIntosh Co. with which to pay the notes, and the rights in the shares acquired by Dauphin Deposit in connection with the trust agreement dated October *88 22, 1959, created a substantial defense to the makers' obligations which could be asserted against any assignee of the notes. No payments were due on any of the notes until 1960, and there is no contention made, or evidence to support it, that any payments were made on the notes during 1959. The questions are (1) whether the non-negotiable, non-interest-bearing notes received by Sam in 1959 constituted an amount realized, in the form of property, by Sam in 1959 in exchange for the 223 shares of stock within the meaning of section 1001(b); and (2), if so, the fair market value of the "property" so received. It appears that some confusion in this area has been engendered by a failure to distinguish adequately between these two questions. See Denver & Rio Grande Railroad Co. v. United States, 318 F. 2d 922. In fact, in his briefs filed herein respondent does not discuss whether the notes qualified as an amount *89 realized under section 1001(b) but considered only the question of the fair market value thereof. Negotiable promissory notes given in exchange for property are within the meaning of the term "property" for purposes of section 1001(b), and the fair market value thereof would ordinarily be considered as an amount realized in the year the exchange occurs. Cf. Joseph Marcello, Jr., 43 T.C. 168, remanded on other grounds [,] 380 F. 2d 499; Alvin B. Lowe, 44 T.C. 363, 372. On the other hand, this Court has held in a long line of decisions that a mere contractual obligation to make payments in the future is not an "amount realized" by a cash-basis taxpayer in the current year unless the obligation is embodied in a note or other evidence of indebtedness possessing the element of negotiability and freely transferable. Nina J. Ennis, 17 T.C. 465, 470. See also Curtis R. Andrews, 23 T.C. 1026; Estate of Clarence W. Ennis, 23 T.C. 799; Harold W. Johnston, 14 T.C. 560; Perry v. Commissioner, 152 F. 2d 183, affirming a Memorandum Opinion of this Court; Dudley T. Humphrey, 32 B.T.A. 280; Bedell v. Commissioner, 30 F. 2d 622, affirming [,] 9 B.T.A. 270. The facts in this case are very *90 similar to those in Dudley T. Humphrey, supra, wherein the taxpayer sold an interest in a partnership in consideration of $72,626.99 in cash and the balance by notes of the purchasers, dated the same day as the agreement, payable on a date 1 [one] year later, with interest, which notes were non-negotiable. In holding that the non-negotiable notes were not includable in taxpayer's income for the year of sale, this Court pointed out that the notes were unsecured and were received by taxpayer as evidence of the indebtedness due him and not in satisfaction of the indebtedness, and that a mere promise to pay in the future which is not accepted in payment, but only as an evidence of indebtedness, is not ordinarily the equivalent of cash. We think the rule of this case not only finds support in present day law but also has the advantage of providing a relatively easy and accurate method of determining when and by how much the receipt of a non-negotiable obligation to pay an amount in the future constitutes income. See Denver & Rio Grande Railroad Co. v. United States, supra. We think it is quite clear from the evidence in this case that the notes given to Sam by Lambert, Murphy, and William, *91 Jr., in 1959 were not intended to be, and were not received by Sam as, payment for the 223 shares of stock, but were given and received only as evidence of the indebtedness due Sam for the shares of stock, which, under the terms of the agreement, were to be delivered to the purchasers only at the time the payments were made as called for in the notes. We therefore conclude that this issue is controlled by the rationale of Dudley T. Humphrey, supra, and the other cases cited above in conjunction therewith, and that the value of the notes, if any, was not includable in Sam's income in 1959 as an "amount realized" upon the exchange of stock. In closing we also note that for the various reasons relied upon by petitioner and related above, and for other reasons argued by petitioners in their briefs, we are very doubtful that any fair market value could be assigned to these notes in 1959. Cf Bedell v. Commissioner, supra, wherein Judge Hand said, at p. 624, "it is absured to speak of a promise to pay a sum in the future as having a 'market value,' fair or unfair." Decision will be entered under Rule 50 in Docket No. 2529-65. Decision will be entered for the respondent in Docket No. 2530-65. *92 Footnotes
1. Jack D. Murphy was the company's office manager. He was initially employed in 1952. He is hereafter referred to as Murphy.↩
2. The correct figure corresponding to the stock interest of William, Jr., is $47,539.48. The figure shown above is that which was reflected in the return and which is in dispute in these proceedings. There is no explanation in the record for the use of the lesser amount in the return.↩
3. The record is unclear as to whether Carmen, the second wife of William, Sr., was alive at the time he died and whether the interest under the will survived Helene's election to take under Florida law. In any event, there is no dispute between the parties that Helene, Sam, and William, Jr., actually received the assets of the estate as provided in the settlement agreement.↩
1. Dorothy was Sam's first wife. Sam and Dorothy were divorced in October 1959, as described hereinafter.↩
4. Concrete highways are laid in continuous slabs with joints between each slab of concrete to provide for expansion and contraction due to temperature changes. The joints are filled with bituminous material. In time the joint material deteriorates, allowing water to enter the joint and fill any voids under the concrete. The water mixes with the subsurface material and is forced back out of the joints by the action of traffic passing over the concrete slab. Unless this condition is corrected, the subsurface support for the concrete slab is withdrawn and the slab will settle or crack. The Highway Department's subsealing program involved drilling holes in the affected concrete slabs and forcing hot liquid bituminous materials (known as U-1 asphalt) through the holes until all the voids under the slab were filled. When the asphalt solidified, it provided support for the concrete and prevented further loss of the subsurface support.
5. Although the record is not clear, it appears that the escrow arrangement established by the sales agreement was terminated as a result of the settlement and that Graf delivered the remaining shares to the purchasers.↩
6. All references are to the Internal Revenue Code of 1954 unless otherwise stated. ↩
7. SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. * * *
(c) Determination of Shareholder's Portion. - * * *
(2) Limitation. - A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of - (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation). 8. The shareholder's portion of the corporation's net operating loss is a deduction for the taxable year in which or with which the taxable year of the corporation ends. Sec. 1374(b)↩.
9. Sec. 1.1014-3(a) Fair market value. For purposes of this section and § 1.1014-1, the value of property as of the date of the decedent's death as appraised for the purpose of the Federal estate tax or the alternate value as appraised for such purpose, whichever is applicable, shall be deemed to be its fair market value. If no estate tax return is required to be filed under section 6018 (or under section 6018 (or under section 821 or 864 of the Internal Revenue Code of 1939↩), the value of the property appraised as of the date of the decedent's death for the purpose of State inheritance or transmision taxes shall be deemed to be its fair market value and no alternate valuation date shall be applicable.
10. It would appear that McIntosh Co. continued to use an estimated useful life of 4 to 5 years in computing depreciation on its equipment for years subsequent to 1954.↩
11. There is no indication in Raflo's report how he arrived at this figure.↩
12. Petitioners request a finding of fact that the company was indebted to William, Sr., in the amount of the advances. Respondent states that there is no competent evidence showing that such an indebtedness existed. Petitioners propose an adjustment to the company's balance sheet for July 31, 1954, which treats the advances as equity capital. Respondent states that petitioners have presented no competent evidence or accounting theory which justified treating the advances as equity capital.
13. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. * * *
(b) Amount Realized. - The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *↩